Albert W. GASS and Gass & Schroeder, Inc., an Illinois corporation, Plaintiffs-Appellees Counterdefendants-Appellants,

v.

GAMBLE–SKOGMO, INC., a Delaware Corporation, Defendant-Appellant Counterclaimant-Appellee.

Nos. 15283, 15284.

United States Court of Appeals Seventh Circuit.

Feb. 25, 1966.

Certiorari Denied May 16, 1966.
See 86 S.Ct. 1464.

---

John A. Cook, Samuel M. Lanoff, Chicago, Ill., for Albert W. Gass and Gass & Schroeder, Inc.; Morgan, Halligan, Lanoff & Cook, Chicago, Ill., of counsel.

R. Lawrence Storms, Thomas A. Reynolds, Edward J. Wendrow, Chicago, Ill., for Gamble-Skogmo, Inc.; Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Before SCHNACKENBERG, CASTLE and KILEY, Circuit Judges.

CASTLE, Circuit Judge.

Plaintiffs Albert W. Gass and Gass & Schroeder, Inc., a corporation owned by Gass, brought this diversity action against Gamble-Skogmo, Inc. (hereinafter referred to as Gamble) to recover compensatory and punitive damages for fraud and deceit. Gamble counterclaimed for goods sold. Plaintiffs defended the counterclaim on the ground that the orders for the goods were obtained by the fraud declared upon in their complaint.

The cause was tried to a jury which returned a verdict for plaintiffs in the sum of $100,000, approximately $72,000

of which represents punitive damages and the balance the claimed actual damages. The jury also returned a verdict in favor of Gamble in the sum of $10,241.66 on its counterclaim. Judgments were entered on the verdicts.

Gamble in its appeal (No. 15283) contends that there is no evidence to establish fraud or deceit upon its part and therefore the District Court erred in failing to grant its motion for judgment notwithstanding the verdict. Gamble additionally contends the court erred in the procedure followed with respect to instructions, erred in giving certain instructions, and asserts that inconsistency in the verdicts requires that they be set aside. Although plaintiffs prosecuted an appeal (No. 15284) from the judgment entered on the counterclaim they do not urge it is erroneous insofar as it serves only as a set-off against the judgment awarded plaintiffs.

■ The District Court properly denied Gamble's motion for judgment n. o. v. if the record discloses evidence which justified the submission of the case to the jury. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Lambie v. Tibbits, 7 Cir., 267 F.2d 902. In determining that question we must view the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiffs. Woods v. Geifman Food Stores, Inc., 7 Cir., 311 F.2d 711, 713; Pinkowski v. Sherman Hotel, 7 Cir., 313 F.2d 190, 192.

Our examination of the record in the light of the governing principle above set forth convinces us that it contains evidence which warrants a jury finding of the presence of those elements requisite to establish liability in Gamble for fraud and deception wantonly and designedly perpetrated by Gamble upon plaintiff Gass and his corporation.

We will not extend this opinion to accommodate a detailed recital of the evidence but will briefly relate the factual background which formed the setting in which the pertinent events occurred and point to some of the conduct on the part of Gamble's representatives, with respect to which there is support in the record, and which serves to sustain the verdict.

During the period here pertinent Gamble was engaged in the wholesale distribution and retail sale of hardware, appliances, and miscellaneous merchandise. It owned 500 stores in its own account. It franchised over 2000 retail stores in the United States and Canada to operate under its name as a part of the Gamble "chain". These franchised dealers are private, investors-owners, who purchase their products for resale from Gamble, and receive general business assistance from Gamble in the operation of their respective stores. Such assistance includes a bookkeeping-accounting service in connection with which the franchised dealer or store operator submits a weekly report of the store's receipts and expenditures to Gamble on a form furnished by it and receives a monthly report or statement from Gamble.

Gass is a semi-retired former retail grocery chain and advertising agency executive. He was interested in investing in a business but not in becoming the operating owner. In October, 1961, Gass responded to a Gamble advertisement for franchise-store dealers. Gamble sent him its brochure entitled "Planned Success" containing representations concerning Gamble's relationship with its franchise dealers, describing the accounting and business services furnished, and setting forth representative sales and profit figures of Gamble store operators. This was followed by a visit from Ora McCarger, Gamble's development representative for a six-state area, including Illinois. McCarger's duty was to develop new stores.

Gass explained to McCarger his requirements for investing in the operation of a Gamble franchise store. These criteria, which were later repeated in correspondence and subsequent oral discussions, and remained constant during the period which ensued, involved the factors that Gass desired as a co-owner, who would operate the store, an individual

who was a successful person capable of assuming control of the enterprise, and who had $15,000 to invest in the venture. Gass was prepared to invest the balance of the funds required. The co-owner would receive a salary and in addition a share of the net profits, which he could use to buy out Gass' interest.

After a proposal to open a store near Rockford, Illinois, on the basis outlined failed to materialize, McCarger, in July, 1962, advised Gass that he might have a new prospect at a new location. In October, McCarger disclosed the location to be Hoopeston, Illinois, and the prospective co-owner to be Harold Schroeder, the operator of a Gamble franchise store at Tuscola, Illinois, since 1959, who, it was stated, was looking for a larger operation. Schroeder was a high school graduate. He had no training in accounting and the Tuscola store was his first business venture. He had formerly worked as a truck driver and a salesman. Hoopeston was a potentially desirable market estimated as capable of producing a sales volume in excess of $200,000 per year. McCarger represented Schroeder as being the operator of a "very successful" Gamble store at Tuscola; a good salesman who had done a "terrific job"; and who had bought the Tuscola store "on a shoestring" and had developed the business to the point where he had a sizeable investment and the necessary funds to make the $15,000 investment Gass required. Following McCarger's October visit Gass wrote him on November 3, 1962, requesting that he be furnished "a picture of the store operations at Tuscola" and an estimate of Schroeder made by his supervisor. The letter went unanswered but shortly thereafter McCarger and Bernard C. Heile, Gamble's zone superintendent for 18 Illinois stores, including Schroeder's operation at Tuscola, met with Gass. When Gass inquired as to when he would receive the store operating statements requested he was informed by Heile that they were regarded as confidential and couldn't be shown to him. Gass stated he wanted to see them for the purpose of determining how suc-

cessful a store manager Schroeder was, how the store was running, and if Schroeder had the $15,000 to invest. Heile assured Gass that Schroeder had the $15,000 and was a successful store manager. He promised to furnish Gass with written information on Schroeder's financial ability.

Gass, Heile, and McCarger met with Schroeder, the proposal was outlined, and the group went to Hoopeston to examine the location. On November 27, 1962, the group met again at Hoopeston where the terms of a lease for the building to be occupied by the proposed store were negotiated with the owner of the property. Gass asked Heile for the promised financial statement on Schroeder. Heile replied that he hadn't gotten it because a physical inventory would have to be taken of the Tuscola store in order to prepare such a statement, but he would see to it that such an inventory was taken the next weekend. McCarger assured Gass that he had a buyer for the Tuscola store and that it would sell for $15,000 or more. On December 20, 1962, the application Schroeder had made to Gamble in connection with the proposed Hoopeston store was shown to Gass by McCarger. It indicated Schroeder's net worth at $11,000. The Tuscola store inventory was listed at $12,000 and Schroeder's annual salary was shown at $3900. McCarger advised Gass that Schroeder's sales were $65,000 per year. McCarger stated that the $12,000 figure was the result of an understatement of the inventory.

On December 27, 1962, Gass was advised by McCarger that the Tuscola store had been sold, that Schroeder's $15,000 was forthcoming, and "everything is fine". On the next day Gass entered into an agreement with Schroeder under the provisions of which $80,000 would be invested in a new corporation to operate the Hoopeston store. The agreement provided that Schroeder was to supply $16,000 and Gass the balance. Gass then proceeded to organize such a corporation, deposited $36,500 to its account, and executed and delivered the lease for

the store building for a five year period at a rental of $3600 per year. Gass purchased and paid for merchandise and services for the opening of the Hoopeston store in the sum of $19,569.50, and ordered and incurred a liability for an additional $10,241.66 of merchandise from Gamble, and prepared to open the store.

When, on January 24, 1963, the sale of the Tuscola store was closed and completed, Schroeder after applying the proceeds to the payment of the obligations of the business, including $3600 to Gamble, had but $277.60 and still owed $1500 in connection with the original purchase of the Tuscola store from John Rothgeb in 1959. The inventory of the Tuscola store proved to be but $6,374.39. Gass, upon learning that Schroeder did not have the $15,000 to invest in the enterprise, and that Schroeder's Tuscola operation was not the success it had been represented to be, liquidated his investment toward opening the Hoopeston store at a total out of pocket loss of approximately $28,000, including the $10,241.66 account with Gamble for goods furnished. The losses were all losses of Gass. Schroeder advanced no money in connection with the transactions involved; nor did he put any money in the corporation, for stock or otherwise.

Although in its argument Gamble attempts to saddle Schroeder with the blame for the misinformation Gamble supplied to Gass an analysis of the record reveals there is evidence which warranted a conclusion by the jury to the contrary. Gamble did the accounting for Schroeder and obviously was aware of the financial details of the Tuscola operation. The monthly statements Gamble compiled from the weekly reports sent in by Schroeder disclosed that the annual sales of the Tuscola store had not exceeded $40,000. But Gamble represented them to be $65,000, apparently to cloak Schroeder with an aura of "success" comparable to that reflected by annual sales of such amount under the standards employed to measure sales and profits of representative Gamble store operators as described in the brochure it had previously furnished Gass. And Heile knew that the $12,000 inventory figure appearing in the financial data on Schroeder which McCarger showed to Gass was not the result of a physical inventory, which Heile had represented would be taken and would be necessary to provide such a financial statement, but was the result of a computation made by Heile on the basis of book inventory as arrived at under the accounting system employed by Gamble and contained in the monthly statements furnished by Gamble to Schroeder.

Heile had supplied the $12,000 figure to Schroeder for inclusion in the statement concerning his financial status. Heile knew that there was no basis in fact for his statement to Gass that the $12,000 figure represented an understatement of inventory.

It is apparent from the record that Schroeder did not understand the book inventory system employed by Gamble in its monthly accounting statements— nor its significance. Gamble used 73% of total retail sales to represent the cost of goods sold and then used the cost figure in computing the book inventory from month to month. The book inventory figure was reached by deducting the cost of goods sold from the sum of the opening inventory plus purchases. The resulting inventory figure could be accurate only if a uniform 27% markup was used as to every item sold. Schroeder's superintendent Heile knew that Schroeder did not mark up the full amount suggested by Gamble.

It is also apparent from the record that Schroeder's operation of the Tuscola store was not the success it was represented to be. And the jury was warranted in concluding that Gamble knew this from the accounting data it had received from Schroeder and employed in the monthly statements. Schroeder had started in Tuscola in 1959. He invested $3,000 in the business. When he sold it his $3,000 was gone and after application of the sale proceeds to obligations of the business he still owed the original owner $1,500. Schroeder worked at the

business full time and his wife half-time. The total amounts they had taken for salaries were $4,080 in 1960; $3,150 in 1961; and $2,391 in 1962. And these modest salary withdrawals were not for the purpose of leaving profits in the business. In 1960 the business lost $84.35; In 1961 the loss was $1,012; and in 1962 the book profit shown as $2,012.77 was in fact a loss of almost $4,000 on the basis of the actual physical inventory.

■ We are of the opinion that under the facts and circumstances involved the misrepresentations made to Gass by Gamble concerning the $12,000 inventory figure in Schroeder's financial statement, the misrepresentation made as to Schroeder's annual sales, and the misrepresentation made with respect to the success of his Tuscola operation, are of themselves sufficient to establish a fraud and deception on the part of Gamble. The elements requisite to such a conclusion, as defined in Harry Alter Company v. Chrysler Corporation, 7 Cir., 285 F.2d 903 and Roda v. Berko, 401 Ill. 335, 339–340, 81 N.E.2d 912, are all present.

■ Gamble urges that there is no evidence to justify an award of punitive damages and the court therefore erred in instructing on the subject. We perceive no error in this connection. Exemplary damages are properly recoverable in an action for fraud and deceit where the false representations are wantonly and designedly made. Laughlin v. Hopkinson, 292 Ill. 80, 89, 126 N.E. 591. And the record here supports such a conclusion. In addition to the evidence already summarized there are additional elements bearing on this phase of the matter. There is testimony that when Schroeder became aware that the inventory figure supplied by Heile was an overstatement and that the proceeds from the sale of the Tuscola store would not produce the $15,000 he was to invest in the Hoopeston venture he was told by McCarger and Heile to "keep your mouth shut" and that "Gass was in so deep that he couldn't back out". It was not until February 7, 1963 that Schroeder advised Gass that he had no money. Gass instructed Schroeder to draw no more checks on the corporation account. The following week Heile and McCarger called at Schroeder's home at 4:00 or 5:00 o'clock in the morning and attempted to get him to give them a check for the $10,241.66 account with Gamble for the balance of the merchandise furnished. The foregoing conduct of Gamble's representatives amply serves to demonstrate the existence of the wantonness and design which authorizes an award of punitive damages.

■ Gamble further complains that the court in paraphrasing the pleadings to the jury referred to an allegation of the complaint, and its denial by the answer, that Gamble "knew or should have known" that the alleged representations were false. But the jury was properly instructed with respect to the element of knowledge on Gamble's part prerequisite to its liability for the falsity of any statement constituting a misrepresentation. In the context in which it occurred we do not view the tangential reference to the language of the complaint as an issue instruction requiring reversal. And, inasmuch as the jury was properly instructed, and the parties advised as to the instructions the court would give, we find no resulting error in the procedure followed by the court in giving the instructions.

■ We perceive no merit to Gamble's contention that the judgment orders must be reversed because of inconsistency in the verdicts. The separate verdicts, and judgments entered thereon, were but a procedural device to facilitate disposition upon review. The judgment on the counterclaim is available as a set-off against the judgment for the plaintiffs. The defendant has not been prejudiced in any manner by the procedure employed.

■ We have concluded that the record supports an award of punitive damages and we are fully cognizant of the Illinois doctrine that punitive damages need not bear a proportional relation to the compensatory damages and that the jury's assessment, left undis-

turbed by the trial court, is not subject to arbitrary action on review. Bucher v. Krause, 7 Cir., 200 F.2d 576, 586–587. Nevertheless, we are convinced that allowing full reach to the jury's authority in the instant case to inflict damages for example's sake and by way of punishment to the defendant (Laughlin v. Hopkinson, 292 Ill. 80, 89, 126 N.E. 591) the damages awarded are in any event excessive. Our affirmance is therefore conditioned upon the plaintiffs filing a remittitur of damages on the $100,000 judgment entered for the plaintiffs against the defendant to the extent of $25,000, thereby reducing said judgment to $75,000, from which the $10,241.66 judgment entered on defendant's counterclaim is to be set-off.

Plaintiffs are allowed costs on appeal.

Affirmed subject to remittitur.