**Thomas M. HANNIGAN and Tru-Han Corporation, Plaintiffs-Appellees,**

v.

**SEARS, ROEBUCK AND CO., Defendant-Appellant.**

**No. 16934.**

United States Court of Appeals Seventh Circuit.

April 15, 1969.

Rehearing Denied June 4, 1969.

Before DUFFY and HASTINGS, Senior Circuit Judges, and FAIRCHILD, Circuit Judge.

HASTINGS, Senior Circuit Judge.

Defendant Sears, Roebuck and Co. (Sears) appeals from a judgment entered by the district court upon a jury verdict finding Sears to have wrongfully and intentionally interfered with the contractual relationship between Fabricated Products, Inc. (Fabricated) and plaintiffs Thomas M. Hannigan and the Tru-Han Corporation (Tru-Han). Upon the jury's assessment of damages, the court awarded plaintiffs $30,000 in compensatory damages and $90,000 in exemplary damages.

Defendant contends the trial court erred as a matter of law in refusing to grant its motion for a directed verdict on counts 4 and 5 of plaintiffs' complaint which alleged the wrongful interference with plaintiffs' contractual rights.[1] Further, defendant asserts error arising from the trial court's denial of its motion to set aside the verdict and to enter judgment notwithstanding the verdict, or in the alternative, to order a new trial.

■ In determining whether the trial court properly denied defendant's motions for a directed verdict and for a judgment n. o. v. on counts 4 and 5 of plaintiffs' complaint, we apply the same standards since these motions raise similar questions. Lambie v. Tibbits, 7 Cir., 267 F.2d 902, 903 (1959); Shaw v. Edwards Hines Lumber Co., 7 Cir., 249 F.2d 434, 437 (1957).

■ It is well established that a motion for a directed verdict or for judgment n. o. v. is properly denied where the evidence is such that reasonable men in a fair and impartial exercise of their judgment may draw different conclusions therefrom. Valdes v. Karoll's, Inc., 7 Cir., 277 F.2d 637, 638 (1960); Smith v. J. C. Penney Company, 7 Cir., 261 F.2d

Burton Y. Weitzenfeld, Arthur L. Klein, Harvey J. Barnett, Chicago, Ill., for defendant-appellant; Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., of counsel.

Thomas M. Hannigan, Arlington Heights, Ill., Harold L. Jacobson, Richard E. Mueller, Chicago, Ill., for plaintiffs-appellees; Lord, Bissell & Brook, Chicago, Ill., of counsel.

1. Defendant's motion for a directed verdict was granted on counts 1, 2 and 3 of plaintiffs' complaint which alleged and sought damages for various antitrust violations by defendant. The judgment entered on such directed verdict is not under review on this appeal.

218, 219 (1958). Thus, the propriety of such denials turns on the determination of whether under the facts, as disclosed by the record, there was sufficient evidence to warrant the submission of the case to the trier of fact. Gunning v. Cooley, 281 U.S. 90, 92–94, 50 S.Ct. 231, 74 L.Ed. 720 (1930); Farmers State Bank of Valparaiso v. Dravo Corporation, 7 Cir., 321 F.2d 28, 39 (1963); Smith v. J. C. Penney Company, *supra*. In making this determination, we are obliged to view all the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to plaintiffs. Gass v. Gamble-Skogmo, Inc., 7 Cir., 357 F.2d 215, 217 (1966), cert. denied, 384 U.S. 943, 86 S.Ct. 1464, 16 L.Ed.2d 541; McKay v. Upson-Walton Company, 7 Cir., 317 F.2d 826, 828 (1963); Pinkowski v. Sherman Hotel, 7 Cir., 313 F.2d 190, 192 (1963).

Viewing the record in this light, the evidence shows that in May, 1956, plaintiff Tru-Han Corporation was organized under Illinois law by plaintiff Thomas M. Hannigan. Hannigan, a citizen of Illinois, was president of and majority stockholder in Tru-Han. Sears is a New York corporation with its principal place of business in Illinois.

It is undisputed that in 1957, Tru-Han became a distributor of metal outdoor storage buildings manufactured by Fabricated and that in 1958, Hannigan conceived of a new idea for outdoor storage, *i. e.*, an outdoor metal storage cabinet or locker. After negotiations, Hannigan and John Columbini, president of Fabricated, entered into an agreement [2] on July 17, 1958 whereby Fabricated contracted to manufacture these cabinets *exclusively* for Hannigan; in consideration thereof, Hannigan agreed to purchase all such outdoor storage cabinets from Fabricated. The contract placed no limitations on Fabricated's right to manufacture and sell its metal outdoor storage buildings, and Fabricated continued to manufacture and to sell such storage buildings to various customers, including defendant Sears and plaintiff Tru-Han.

Pursuant to and in accord with this contract, Hannigan through the Tru-Han Corporation, sold the Fabricated manufactured lawn lockers to its various customers, which included Sears. Sears became a customer in early 1959 and continued to purchase lawn lockers from Tru-Han until September, 1962, at which time Fabricated began to sell lockers directly to Sears and to pay Hannigan a commission of 10% on each sale.

The record reveals that in March, 1959, a buyer for Sears, Brad J. Wake-

2. "AGREEMENT made and entered into on this 17th day of July, 1958, by and between Thomas M. Hannigan of Chicago, Illinois, called the buyer and Fabricated Products of Fenton, Michigan, hereinafter called the seller.

"WHEREAS: The buyer has designed a modulaw multi-purpose metal storage cabinet made of fabricated sections approximately 32″ deep, 64″ long expandable ad infinitum and approximately 60″ high, and is desirous of having the seller make the said cabinets for the buyer exclusively and for the seller not to engage in the sale of said cabinets and sections to any one else directly or indirectly and the seller is interested in manufacturing the said cabinets and selling them to the buyer exclusively; It is hereby understood and agreed.

"1) For and in consideration of the buyer purchasing the said cabinets for the basic price of $18.00 for the 30″ x 60″ x 56″ high from the seller exclusively so long as the seller is able to furnish and fill orders within a reasonable time, the seller hereby agrees that it will not compete with the buyer directly or indirectly on cabinets of this nature. This is in no way to be construed to prevent the seller from selling its present line of utility buildings.

"2) For and in consideration of the sellers covenant not to compete with the buyer, the buyer agrees to purchase all of the Garden Cabinets specified above that he may use from the seller, so long as the seller can supply the buyer as stated heretofore.

"In witness whereof we have hereunto set our hands and seals this day and year first written above."

man, attempted by letter [3] to persuade Fabricated's sales manager, Robert Ross, to sell the lawn lockers directly to Sears notwithstanding its exclusive contractual commitment to Hannigan. Sears' avowed purpose for inviting Fabricated into a direct purchasing relationship was to avoid and to eliminate the profit of the middle-man, Tru-Han. Respecting its contractual obligation, Fabricated declined this invitation.

In June, 1960, Harold Crittenden replaced Wakeman as Sears' buyer of utility buildings and lawn lockers and continued to serve in that position until June, 1962. During Crittenden's tenure as buyer for Sears, Fabricated mistakenly sent Sears a Tru-Han invoice which disclosed the basic manufacturing price Hannigan was paying to Fabricated for lawn lockers and utility buildings. This mistake enabled Sears to become aware of the difference between the manufacturing price and the price it was paying for the lawn lockers. As a result, Sears attempted without success to induce Hannigan to lower his sales price on the lockers. On failing to persuade Hannigan to reduce the price, Sears entered into an agreement with Products Engineering Manufacturing Corporation (Pemco) to produce lawn lockers.

While Pemco was able to produce a somewhat differently designed lawn locker at a lower price than plaintiffs' sales price, the Pemco relationship did not provide a satisfactory solution to Sears' problem because Pemco experienced difficulty in filling Sears' orders for lockers. Sears continued to purchase some Fabricated produced lawn lockers from plaintiffs after entering into the Pemco agreement. Pemco went out of business in the fall of 1962.

In June, 1962, John T. Mitchell replaced Crittenden as Sears' buyer of lawn lockers and utility buildings and continued in that capacity until December, 1966.

During July or August of 1962, Mitchell, in an apparent effort to meet Sears' lawn locker needs, attempted to persuade Fabricated to sell lockers directly to Sears. To perfect such an arrangement, Mitchell told Columbini, with full knowledge of Fabricated's exclusive lawn locker contract with Hannigan, that Sears "* * * wanted one supplier of the entire line [both utility buildings and lawn lockers], * * *, and if he [as president of Fabricated] couldn't supply it that way I would have to look to the other people that I was dealing with." There was also testimony Mitchell told Columbini that Fabricated could "make more money" on the sale of the lockers by selling directly to Sears and bypassing plaintiffs.

Mitchell suggested that Columbini work out something with plaintiffs so

3. "March 10, 1959
Mr. Robert W. Ross
Fabricated Products, Inc.
19962 Conant Avenue
Detroit 34, Michigan
Dear Bob:
Last week it was brought to my attention that the Tru-Han Corporation had planned on selling to Sears, Roebuck and Co. the Storage Cabinet which you advised was being made for Tru-Han only. For your information, I have to put a stop to Tru-Han selling this item to Sears, Roebuck and Co. I am not sure whether Tru-Han contacted Sears or whether someone in our building material department contacted Tru-Han. Nevertheless, he is not to sell this item to Sears, Roebuck and Co., as I am the buyer of all of this type of storage building and equipment.

I would like to know exactly how many of these Storage Cabinets Tru-Han has sold and whether or not you would be interested in selling to Sears, Roebuck and Co. direct or perhaps making a similar cabinet for Sears, Roebuck and Co. We certainly do not want to be paying Tru-Hau Commission for handling this item for Sears, Roebuck and Co. I also understand that this building is going to to be listed in Ward's catalog.
I would appreciate a prompt reply in regard to the above.
Yours very truly,
Sears, Roebuck and Co.
B. J. Wakeman—Buyer
Farm Equipment Dept. 632
BJW/me
cc: Mr. J. Columbini"

Fabricated could serve as Sears' source for both lawn lockers and utility buildings.

At the time Mitchell advised Columbini of Sears' plan to purchase lockers and buildings from a common source, Fabricated was in large measure economically dependent upon Sears. Fabricated was selling utility buildings directly to Sears, and 60% of Fabricated's "business was devoted to Sears as a customer." Columbini told Mitchell that " * * * if we lost the Sears business [as a result of the single source plan] that we couldn't exist. We couldn't continue to make cabinets for Tru-Han or any other customer for that matter."

After talking with Mitchell and learning of Sears' common source purchasing plan, Columbini contacted Hannigan and told him that " * * * we had to make some agreement or understanding with each other with respect to selling these cabinets directly with Sears, * * * [otherwise], we would stand a chance of losing the entire line of cabinets and buildings, * * *."

Thereafter, Hannigan did submit to a new arrangement[4] under which Fabricated would sell lockers directly to Sears and Hannigan would receive a 10% commission on the sale of each such locker. Under this modified arrangement, Sears purchased lockers at a lower price, and Hannigan received significantly less on the sale of each locker.

In substance, plaintiffs alleged that Sears wrongfully and intentionally interfered with their contractual rights by inducing Fabricated to amend its contract with Hannigan and coercing Hannigan into involuntarily agreeing to such amendment.

On appeal, Sears states that, as a matter of law, the contract was not breached but rather "was modified to permit the sales of lockers by Fabricated to defendant in exchange for the payment of commissions to plaintiff Tru-Han * * *." Further, Sears contends that, as a matter of law, the modification was not obtained by coercion. We disagree.

Viewing the facts in the light most favorable to plaintiffs, we find the case was properly submitted to the jury, and the jury could reasonably have found, as it apparently did, that Sears intentionally interfered with plaintiffs' contractual rights with a resulting involuntary modification of the original contract with Fabricated. It follows that the trial court did not err in denying defendant's motions for a directed verdict and judgment notwithstanding the verdict.

Without attempting to assess the jury's reasoning in reaching its verdict, it would not be unreasonable for it to have concluded: that Sears, in an effort to obtain an adequate number of lockers at a lower price than it was paying Tru-Han, induced Fabricated to seek a modification of its contractual obligations with Hannigan; and that Sears knew

---

4. "AGREEMENT for commission compensation pertaining to sales of storage cabinets to Sears, Roebuck & Company.

"WHEREAS there is in existence a contract between Fabricated Products, Inc. and Thomas Hannigan entered into in July of 1958, pertaining to storage cabinets and it is desired by the parties to modify that contract in the following particulars only:

"For and in consideration of Thomas Hannigan consenting to modifying the terms of the said contract by allowing Fabricated Products, Inc., to sell the following model cabinets direct to Sears, Roebuck & Company at an increase of profit to Fabricated Products, Inc., Fabricated Products, Inc., agrees to pay

Thomas Hannigan the sum of $3.00 on every K–5 cabinet, $4.45 on every T–6 cabinet and $6.84 on every T–10 cabinet, which sum is based on 10% of the selling price set by Thomas M. Hannigan. The said commission to be due and payable on Friday of each & every week. That is, all cabinets shipped from Monday to Saturday, Fabricated Products, Inc., agrees to pay the said commissions to Thomas M. Hannigan on the following Friday.

"This contract shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.

"IN WITNESS WHEREOF we have hereunto set our hands and seals this 11th day of August 1962."

Hannigan had no practical alternative but to acquiesce in the contractual modification.

It is evident that if Hannigan had refused to assent to the modification, Fabricated would have lost all of Sears' business. Because of its economic dependency upon Sears, Fabricated would have been forced out of business leaving plaintiffs in the precarious economic position of being without their sole source of lawn lockers. Columbini's testimony accurate-Hannigan " * * * had no choice in the matter [but to accept the modification and permit Fabricated to sell directly to Sears] * * *."

▋ To us, there is no legally significant distinction between unabashed third party conduct which induces one party to outrightly repudiate and breach its contract with another and subtle third party conduct which achieves essentially the same result through the equally questionable means of coercing a contractual modification. Both approaches are equally tortious in nature and similarly interfere with the contractual relationships of others.

To distinguish between conduct which directly causes a breach of contract and unjustifiable coercive conduct which effects the same result *without a breach* would overly limit the significance of the tort of inducing breach of contract and invite today's superior economic forces to freely interfere with contractual relationships without fear of legal reprisal.

We are in accord with Professor Prosser's statement that this tort " * * * does not require inducement to action as a means or complete repudiation as a result." Prosser, Torts § 123 at 959 (3d ed. 1964).

▋ The traditional elements of the tort of inducing breach of contract are: (1) an existing contract between the plaintiff and a third party; (2) defendant's knowledge of this contract; (3) an intentional unjustified inducement to breach the contract; (4) a subsequent breach by the third party; and (5) re-

sulting damage to the plaintiff. National Gas Appliance Corp. v. Manitowoc Company, 7 Cir., 311 F.2d 896, 899 at n. 5 (1962), citing Northern Insurance Co. of New York v. Doctor, 23 Ill.App.2d 225, 161 N.E.2d 867 (1959); Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176, 181–182 (1954).

▋ In the instant case, it is undeniable that there was an existing contract between Hannigan and Fabricated and that defendant Sears had knowledge of this contract. It is also true that at different times and in varying ways, Sears, for purely private business reasons, encouraged Fabricated to either breach or alter its contract with Hannigan. In its effort to induce Fabricated to sell lawn lockers directly to it, Sears threatened Fabricated with severe economic hardships and offered Fabricated greater economic opportunities. Though Sears' overtures did not cause Fabricated to outrightly repudiate and breach its contractual obligations to plaintiffs, Sears accomplished an equivalent result by economically coercing the parties into modifying their original agreement. As a result of this coercion, Hannigan suffered monetarily.

Under these circumstances, Sears could reasonably have been found to have induced a breach of contract within the true meaning of that tort by coercively interfering with Hannigan's contractual relationship with Fabricated.

▋ We find no merit in defendant's contention that Hannigan was not a proper party plaintiff to this action. The gist of defendant's argument revolves around the reasoning that the exclusive contract with Fabricated was made for the benefit of Tru-Han and therefore only Tru-Han could maintain an action on such contract.

A cursory review of the agreement in question reveals that the Tru-Han Corporation is not named in the contract and that the document was executed by Hannigan, individually. Further, the 1962 amendment to this contract was executed by Hannigan, makes no reference to Tru-Han and provides that the 10%

commissions were to be paid directly to Hannigan. This is indicative of the fact that both the original contract and its subsequent modification were intended primarily for the benefit of Hannigan.

Defendant's reliance on the Indiana case of Speedway Realty Co. v. Grasshoff Realty Corp., 8 Ind.Dec. 401, 216 N.E.2d 845 (1966), is misplaced. *Speedway* is readily distinguishable from the instant case.

In *Speedway*, the court held that under Indiana law a shareholder of a corporation had no standing to sue on lease negotiations he had made on behalf of a corporation yet to be formed and which when formed adopted and ratified the acts of the corporate promoter. The court held that under these circumstances the corporation, and not the shareholder-promoter, was the real party in interest to actions arising out of such negotiations.

In the instant case, the suit did not arise out of the negotiations of a corporate-promoter but rather arose out of a contract executed subsequent to the formation of a corporation. As noted, the contract was executed by the corporation's principle shareholder as an individual and made primarily for his benefit. The agreement made no reference to Tru-Han. From these facts, it may be concluded that the individual was a primary party in interest.

In essence, the distinction between *Speedway* and this case rests in the intention of the parties. In *Speedway* the shareholder intended that his activities as a promoter were to benefit a prospective corporation; here the evidence is abundantly clear that plaintiff acted in an individual capacity for purpose of his personal economic benefit.

At the close of all evidence, the trial court granted leave to plaintiff Hannigan to amend counts 4 and 5 of his complaint to include Tru-Han as a party-plaintiff. Defendant contends the trial court erred in granting this leave to amend. Defendant asserts that under Illinois law Tru-Han had no standing to sue due to its failure to timely pay state franchise taxes and the running of the state's applicable statute of limitations.

■ Assuming *arguendo*, without deciding, that Tru-Han did not have standing and that the trial court erred in granting leave to amend, we find the error to be harmless under the posture of this case. The supposed error did not adversely affect or substantially prejudice defendant in its presentation of the case. Further, the claimed misjoinder of Tru-Han could not have had a prejudicial bearing or affect on the jury's veridict or its assessment of damages. The claimed error did not affect defendant's substantial rights. Keaton v. Atchison, Topeka and Santa Fe Railroad Company, 7 Cir., 321 F.2d 317, 319 (1963); Delaney v. International Harvester Co., 7 Cir., 261 F.2d 150 (1958). Fed.Rules Civ.Proc. Rule 61, 28 U.S.C.A.[5]

■ Defendant also contends the trial court erred in admitting into evidence over objection the testimony of plaintiff Hannigan relating to a telephone conversation he had with Columbini. Defendant urges this testimony was self-serving hearsay and improperly impeached plaintiff's own witness, Columbini. Examination of Hannigan's testimony shows that it is substantially in accord with Columbini's testimony, and any variance did not approach impeachment. Again, assuming the admission of Hannigan's testimony was improper, it was harmless. Where testimony is improperly admitted but, " * * * was merely cumulative on matters which were clearly shown by other admissible evi-

5. "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise dis-turbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

dence [then] * * * the admission of [such] * * * testimony was harmless." American Motorists Insurance Company v. Landes, 5 Cir., 252 F.2d 751, 753 (1958); Gerhart v. Henry Disston and Sons, Inc., 3 Cir., 290 F.2d 778 (1961). In the instant case, Hannigan's testimony was merely cumulative in character.

Defendant contends that the jury's assessment of actual damages was based on speculation and conjecture and is therefore invalid. Defendant also asserts the trial court improperly permitted the jury to assess exemplary damages.

The thrust of defendant's argument with respect to actual damages turns on the alleged failure of plaintiffs to adduce evidence from which the net profits on the sale of the lawn lockers to defendant could reasonably be calculated. Defendant argues that the trial court erred in submitting the question of actual damages to the jury because the general law and law of Illinois require that before a jury may assess damages for lost profits plaintiff must introduce evidence of net profits, i. e., "gross profits and those items of expense such as rent, depreciation, telephone, salaries, etc., * * *."

Evidence introduced shows that total direct sales of lockers to defendant by Fabricated subsequent to the modification of the Hannigan-Fabricated agreement amounted to $213,355 upon which Hannigan received a 10% commission of $21,335. Had the original agreement not been modified and had Tru-Han continued to sell lockers directly to defendant, Hannigan's gross profit would have been $60,742; the total sales price would have been $236,772, with cost of goods sold being $176,030. The claimed loss in gross profits due to the modification was computed at $39,408. The jury assessed actual damages at $30,000.

▬▬▬ Under controlling law, it is clear damages may not be uncertain, remote or speculative. However, it is equally true that the requirement of certainty does not necessitate mathematical precision in fixing the amount of damages nor does it permit defendant to complain of the resulting uncertainty where his wrongdoing caused the difficulty in ascertaining the precise extent of actual damages; only a reasonable basis of computation is required for the submission of the question of damages to the jury. Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 376–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927). See 15 I.L.P. Damages §§ 14–15 (1968).

▬▬▬ Where lost profits are sought as damages, the assessed damages are to be based on net profits, or a reasonable approximation thereof, and not on gross profits. Net profits constitute the difference between gross profits and the expense of operating the business. Eastman Co. v. Southern Photo Co., supra; Henry's Drive-In, Inc. v. Anderson, 37 Ill.App.2d 113, 125–127, 185 N.E. 2d 103, 108–109 (1962).

▬▬▬ Hannigan was in the brokerage business and was not engaged in manufacturing. He had customers other than Sears. The incidental costs of doing business with Sears would have been minimal at best. The jury in assessing actual damages reduced the claimed loss of $39,408 to the sum of $30,000. Under the record here, it is evident to us that such a reduction of $9,408 more than adequately covers any costs which Hannigan would have incurred as a direct result of handling this business under the terms of the original contract. We find and hold that the trial court did not err in submitting this question to the jury and that the award by the jury should stand.

▬▬▬ On the question of punitive damages, we find that under the facts and circumstances of this case such damages were properly assessed and awarded. It is an accepted proposition under Illinois law that where the " * * * wrongful act complained of is characterized by wantonness, malice, oppression or circumstances of aggravation", then punitive damages are within the discretion of the jury and trial court. Such damages are utilized to punish the wrong-

doer and to deter the wrongdoer and others from repeating the wrongful conduct. Eshelman v. Rawalt, 298 Ill. 192, 197, 131 N.E. 675, 677, 16 A.L.R. 1311 (1921); Bucher v. Krause, 7 Cir., 200 F.2d 576, 587–588 (1952), cert. denied, 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404. See also 15 I.L.P. Damages §§ 131–133 (1968).

■■■ We are satisfied that the defendant's intentionally coercive and oppressive conduct warranted the assessment of exemplary damages in the instant case. The fact that the exemplary damages are three times actual damages is of no significance, since it is well-settled that punitive damages need not bear a proportional relationship to actual damages. Gass v. Gamble-Skogmo, Inc., 7 Cir., 357 F.2d 215, 220–221 (1966), cert. denied, 384 U.S. 943, 86 S.Ct. 1464, 16 L.Ed.2d 541; Bucher v. Krause, *supra.*

■ Finally, we are not persuaded the trial court erred in refusing to dismiss the suit for want of jurisdiction following dismissal of the antitrust counts.

For the foregoing reasons, the judgment appealed from is affirmed.

Affirmed.