Robert **BURTON** and Curtis B. Clark, Co-Partners, d/b/a Insco, Plaintiffs-Appellees,

v.

**HITACHI AMERICA, LTD.,** a New York Corporation, Defendant-Appellant.

No. 74–1125.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1974.

Decided Oct. 18, 1974.

**722**

R. Dickey Hamilton, Stephen J. Bisgeier, Chicago, Ill., for defendant-appellant.

David P. List, Merle L. Royce, II, Chicago, Ill., for plaintiffs-appellees.

Before HASTINGS, Senior Circuit Judge, and PELL and TONE, Circuit Judges.

HASTINGS, Senior Circuit Judge.

Plaintiffs Burton and Clark had an oral agreement, implemented by letters, with defendant Hitachi to sell Hitachi Japanese electric motors in an exclusive sales territory in Illinois. After an original complaint had been filed, together with a third party action, two counterclaims and an interminable amount of legal skirmishing, this matter was finally submitted for trial by jury some three years later on an amended complaint in three counts charging breach of contract, tortious interference with a contractual relationship, for hiring plaintiffs' partner and salesman, Mahoney, and for conspiracy resulting in the termination of their agency agreement four months after it had begun. Defendant filed a counterclaim based upon fraud.

The jury found for plaintiffs on Count I (charging breach of contract) and awarded damages in the amounts of $27,000 for actual outlays and $35,000 for loss of profits. On Counts II and III together (charging tortious interference and conspiracy), the jury again found for plaintiffs and awarded damages in the amounts of $27,000 for actual outlays, $35,000 for loss of profits and $50,000 for punitive damages. On motion of defendant, the trial court directed a remittitur of $27,000 on Count I (actual outlays), which plaintiffs accepted, leaving a total amount of $147,000 damages awarded plaintiff, upon which judgment was entered. The jury found against defendant and for plaintiffs on defendant's counterclaim and defendant took nothing thereunder.

Defendant appeals only from the final judgment of $147,000 for damages and costs and from the denial of its post-trial motions for further relief. Defendant does not appeal from the final adverse judgment on its counterclaim.

In substance, the issues raised on this appeal challenge the sufficiency of the evidence to warrant the jury's having found a breach of contract, tortious inducement of breach of contract, conspiracy, and the amount of damages assessed. It is also charged that certain instructions given the jury were misleading and erroneous.

The tangled skein of docket entries and pre-trial proceedings almost defies description. Jurisdiction in the trial court was based upon diversity of citizenship. The substantive law of Illinois governs. Most of the acute questions relating to the sufficiency of the evidence may be clarified by a rather full statement of the facts. No special interrogatories were submitted to the jury.

From our careful consideration of the record as a whole we have concluded that basically the following is a narrative of the factual situation which the jury would have been fully justified in finding from the evidence adduced in this case.

Plaintiffs Robert J. Burton and Curtis B. Clark were co-partners and owners of an electrical wholesale supply business, under the firm name of Princeton Electric Supply Company (Princeton Electric), with its principal place of business in Princeton, Illinois. Defendant Hitachi America, Ltd. (Hitachi), is a subsidiary of a Japanese corporation, and is incorporated under the laws of New York with an established place of business in Indianapolis, Indiana. From Indianapolis, Hitachi was engaged in the business of attempting to sell Japanese electric motors in Illinois and elsewhere. Darwin Mitchell served Hitachi as national sales manager of its electric motor division in Indianapolis, and had as his regional sales manager Russell Derderian. Mitchell and Derderian were and had been residents of Indiana.

In August 1969, Burton learned from one of Princeton Electric's customers, Champion Pneumatic, that Hitachi's man Derderian had called them inquiring whether they would be interested in purchasing Hitachi motors. The customer asked Burton whether he would be interested in marketing Hitachi motors or in a franchise through Princeton Electric. Burton then contacted Derderian by telephone and the call led to several preliminary meetings of plaintiffs with Mitchell and Derderian. These meetings culminated in the determination of plaintiffs to form a separate agency. William Mahoney, a salesman for Westinghouse, and Thomas Jolley, a salesman for Reliance Electric, were to join the sales agency, with Mahoney to be in charge.

Since Princeton Electric had certain established customers who might adversely react to their sale of foreign-made motors, plaintiffs, under assumed names, executed a new and separate partnership agreement under the firm name of Insco. Mitchell was advised of this arrangement by Burton and made no objection.

During this interim period Burton made sales calls on two of his old manufacturing customers in Princeton, Champion Pneumatic and Princeton Air Compressors. Using quotations furnished by Derderian, Burton secured three purchase orders from them for a combined total of more than $700,000 worth of Hitachi motors.

In a meeting of plaintiffs and Mahoney with Mitchell and Derderian on November 24, 1969, the proposed Insco plan was presented and discussed. Mitchell agreed to grant Insco an exclusive sales territory encompassing all of Illinois north of Highway 36. Commissions to be paid Insco were discussed, resulting in an agreement to pay what would probably amount to an average commission rate of five per cent. Plaintiffs advised Mitchell that they had estimated it would cost them $50,000 a year to operate the proposed agency and requested an agreement for a specific length of time in order to be assured that they would have sufficient time to recoup their investment and conduct a profitable enterprise. Mitchell agreed that this was a reasonable estimate and said that "it had been his experience that it took two years to get something like this up and rolling." Mitchell assured plaintiffs that they should not be concerned about the length of the agreement because "the Japanese were very honorable people" and that he would not put the length of time of the agreement in writing because Hitachi was an honorable company and that their relationship "would be like a marriage and last forever" and, further, that this relationship was "a matter of mutual trust between the parties." This line of assurance by Hitachi appears throughout subsequent proceedings between the parties, in which Mitchell reiterated that "the Japanese were honorable people, but this would be an affront to them to ask them to put it down [in writing]," and that

plaintiffs "would have nothing to worry about." At the end of this meeting plaintiffs gave Mitchell the three large purchase orders which were accepted by Mitchell with enthusiastic comment.

The parties next talked in Princeton on December 9, 1969, and met Jolley. Further sales discussions ensued and Burton asked Mitchell for a five-year agreement. Mitchell responded as before and also said he would have to discuss it with Hitachi. On December 11, 1969, Derderian wrote to Clark to confirm the interim agreement reached on December 9 that "for approximately six months" certain base prices mentioned would be in force, and to confirm Insco's appointment as exclusive sales representative for Hitachi.

At plaintiffs' request all parties concerned met in Indianapolis on January 14, 1970. Plaintiffs presented a letter prepared by their attorneys to Derderian providing, *inter alia*, that Insco's appointment would be for a five-year term. The letter was shown to Mitchell who again responded as before that, in substance, the Japanese were honorable people and would consider it a personal affront to put this proposal in writing, but he said he could assure them that this relationship was based on mutual trust and would last forever. Burton replied, in closing the discussion, that " 'Forever' was pretty good terms [and] I guess we would have to accept it."

After this meeting on January 14, plaintiffs secured a bank loan for the purpose of financing Insco. The three sales orders were accepted by the bank as collateral for the extension of a line of credit in the amount of $3,800 per month. In February, Mahoney signed the Insco partnership agreement, receiving a 25 per cent interest in the profits and losses of the partnership, and subsequently became liable on the partnership loans from the bank. Jolley started to work for Insco in February 1970 at an annual salary of $14,000. Mahoney began work the second week in April at a $15,000 annual salary and was in charge of the operation of the business.

During the four-month period from April 1970 to August 1970, when both Mahoney and Jolley were active in Insco, together they made between 400 and 500 first sales calls and approximately a thousand repeat calls on customers. Considerable progress was made in laying the ground for future sales orders. In June 1970, a conference between those interested in Insco led to optimistic projections of about three million dollars in sales, although no new business had been closed nor had any new motors been shipped under the original three large orders.

At this time Insco developed an immediate cash flow problem and its bank demanded additional capitalization of the business if the bank was to continue its line of credit. Clark then arranged to sell 25 per cent of Insco to his friend Toohey in return for a loan of $25,000 which was to be repaid out of Insco's first net profits.

About June 15, 1970, Mitchell and Derderian met at lunch with Jolley. They inquired whether the purchasing authorities at Champion Pneumatic or Princeton Air Compressor had an interest in Insco and Jolley replied in the negative. Jolley was then asked whether Mahoney was a partner in Insco and Jolley replied in the affirmative, although he said he did not know the extent of such interest.

About July 15, 1970, Mahoney telephoned Mitchell to ask whether Hitachi would be interested in hiring him and stated, *inter alia*, that Insco's note at the bank was going to be called. Mitchell requested that Mahoney send a resume and Mahoney complied. At about the same time and without revealing his approach to Mitchell, Mahoney did suggest to plaintiffs that he might go to work for Hitachi and spend most of his time in Illinois with Insco receiving the commissions and Hitachi paying his salary. This was rejected as being ridiculous.

On July 31, 1970, Mitchell and Mahoney met in Indianapolis. The outcome was that Hitachi hired Mahoney. They

discussed various accounts that Mahoney could sell in Insco's territory, with Mahoney stating that "Insco should be permitted to continue its sales efforts in the territory specified and, of course, get the commissions due." Plaintiffs first learned about these negotiations on August 7, 1970, when Mahoney advised Clark of his decision to join Hitachi. Mahoney refused to discuss the matter further with Burton and advised Burton that Hitachi's lawyer had stated that he could disregard the Insco partnership agreement. In the interim, Mahoney had unsuccessfully attempted to determine whether the Toohey proposed $25,000 loan had been consummated. Accordingly, on August 7, 1970, Mahoney terminated his employment with Insco and accepted employment with Hitachi. Subsequent efforts by all the interested parties to compose their differences failed.

Earlier in the month and unknown to plaintiffs, Derderian called Princeton Air Compressors and requested it to reissue its purchase order so that it was made out directly to Hitachi instead of its agent, Insco. This was accomplished and the contract was so reissued, Derderian representing that it was financially unrealistic for Insco to handle it. The changed purchase order was received by Hitachi on September 21, 1970. For some undisclosed reason, it was back dated to August 3, 1970, four days before Mahoney accepted Mitchell's employment offer.

Clark wrote to Mitchell September 28, 1970, complaining about rumors of Mahoney's switching orders to Hitachi and the disparaging remarks about plaintiffs' financial condition. Hitachi responded by Mitchell's letter of September 30, 1970, denying the charges and terminating Insco's sales agency. Shortly before this time, Jolley refused an offer by Hitachi for employment in Cincinnati.

During the time that Insco represented Hitachi it made motor sales in the total amount of $4,200. After the Insco sales agency was terminated, Hitachi made new motor sales in Insco's territory in the total amount of $13,741 before it finally gave up its attempts to sell electric motors nationally, about April or May 1972. Hitachi's efforts in Illinois during this period were minimal. It further appears that the two Champion Pneumatic orders were never consummated. One was cancelled because Hitachi failed to send necessary electric motor samples for testing and the other because of its failure to secure engineering approval. The order of Princeton Air Compressors was only partially filled and was wiped out in its subsequent bankruptcy proceedings.

■■ On the issue of whether plaintiffs had an enforceable contract, defendant contends that any such claim is barred by the Illinois Statute of Frauds. Under the facts of this case we find no merit in this contention. Defendant also argues that plaintiffs' claim for breach of contract is barred by the doctrine of mutuality. We need not reach this interesting aspect of the law of contracts, since the Supreme Court of Illinois long ago ruled that a contract is not voidable for lack of mutuality unless the contract is otherwise devoid of consideration. Armstrong Paint and Varnish Works v. Continental Can Co., 301 Ill. 102, 108, 133 N.E. 711 (1921). See also Consolidated Laboratories, Inc., v. Shandon Scientific Co., 7 Cir., 413 F.2d 208, 212–213 (1969). It is clear to us that plaintiffs provided ample consideration for the contract in question.

We pause to refer to a well considered decision of our court, ably authored by our Brother Sprecher, P. S. & E. Inc. v. Selastomer Detroit, Inc., 7 Cir., 470 F.2d 125, 127–129 (1972). There, an oral agreement, later reduced to writing, granted plaintiff an exclusive selling agency contract for certain of defendant's products. The contract failed to fix a time for its duration and called for continual performance. Applying Illinois law, our court held that such a contract is ordinarily terminable at the will

of either party, but that this conclusion did not end the matter. Relying upon a prior decision in Fargo Glass & Paint Co. v. Globe American Corp., 7 Cir. 161 F.2d 811, 813 (1947), we held that regardless of whether the exclusive selling agency contract was terminable at will, the agent was entitled to damages if, as a result of termination of the contract by the principal during the period of development of the market for the new product, the agent incurred expense and devoted time and labor in the matter of the agency without being afforded a sufficient opportunity to recoup from the undertaking. The court also noted that the Illinois Supreme Court has subscribed to the rule that "Every contract implies good faith and fair dealing between the parties to it . . ." 470 F.2d at 128. On whether the question of duration was properly for the jury, the court said:

> "The plaintiff here is entitled to its jury trial. When the plaintiff has presented all of its evidence, the trial court can then determine whether the agreement between the parties was absolutely indefinite as to duration and terminable at will as a matter of law, or whether the proof is sufficient to permit the jury to determine that question as a matter of fact. But in any event, the jury must determine, regardless of whether the contract was terminable at will, whether the plaintiff suffered damages as the result of incurring expense and devoting time and labor in the matter of the agency without being afforded a sufficient opportunity to recoup from the undertaking, as required by *Fargo*." *Id.* at 129.

■■ In the instant case, in contrast to *Selastomer*, it is reasonable to conclude that plaintiffs had a written contract "for approximately six months," as hereinabove set out. With reliable authority, it could also be reasonably contended that such written agreement was extended by oral representations that it would have a duration of at least the development period of two years. Yet, under *Selastomer*, it is not necessary to have an agreement for a specific duration to permit recovery for expenses incurred. Without further detailing the evidence, we are convinced that it was sufficient to warrant the jury in awarding plaintiffs the sum of $27,000 for their actual outlays on Counts II and III. Bad faith in terminating plaintiffs' agreement after four months was present and we so hold. This judgment for $27,000 should be upheld.

■ However, even though damages may be recoverable for expenses incurred prior to contract termination, this is not necessarily to say that damages for loss of profits may be recoverable. Here, the jury not only granted duplicitous awards of $35,000 for lost profits, but the damages granted were indeed too speculative to be recoverable. As we held in a prior case, applying Illinois law: "Damages must not be speculative or probable and they must be proved with a reasonable degree of certainty. [Citing cases.]" Classic Bowl, Inc. v. A M F Pinspotters, Inc., 7 Cir., 403 F.2d 463, 467 (1968). The evidence produced by the plaintiffs here was inadequate. These awards totaling $70,000 for loss of profits must be set aside.

We now consider the award of $50,000 on Counts II and III as punitive damages for tortious interference and conspiracy.

In Hannigan v. Sears, Roebuck and Co., 7 Cir., 410 F.2d 285, 291, cert. denied, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed. 2d 178 (1969), applying Illinois law, we held that "The traditional elements of the tort of inducing breach of contract are: (1) an existing contract between the plaintiff and a third party; (2) defendant's knowledge of this contract; (3) an intentional unjustified inducement to breach the contract; (4) a subsequent breach by the third party; and

(5) resulting damage to the plaintiff. [Citing cases.]" In the instant case there was an existing contract of employment between plaintiffs and Mahoney, i. e., a salary of $15,000 per annum and a 25 per cent interest in the partnership, as the managing partner. It is undisputed that Mitchell knew of this arrangement. Mitchell not only encouraged Mahoney to work for Hitachi, but increased his salary offer when Mahoney declined the first offer; Mitchell knew that Insco was in need of additional capitalization prior to his first offer to Mahoney. There was a subsequent breach by Mahoney and the subsequent loss to Insco of the heart of its sales program. The jury could reasonably have concluded from these and other related factors that the purpose of this inducement was to give Hitachi the benefit of Insco's development of the territory.

In National Gas Appliance Corp. v. Manitowoc Company, 7 Cir., 311 F.2d 896, 900–901 (1963), also cited in Hannigan, supra, we held in substance that when two parties act with the malicious intention to drive a plaintiff out of business that, under Illinois law, this could be sufficient to support a verdict charging unlawful conspiracy to injure plaintiff's business; and, further, that an actual unlawful agreement need not be proved but may be inferred from the evidence of more than a coincidental sequence of events.

In Hannigan, supra, we addressed ourselves to the question of punitive damages. We held that under Illinois law where the "wrongful act complained of is characterized by wantonness, malice, oppression or circumstances of aggravation," punitive damages are within the discretion of the jury and trial court; they may be utilized to punish the wrongdoer and to deter others; and need not bear a proportional relationship to actual damages. 410 F.2d at 293–294. See also Gass v. Gamble-Skogmo, Inc., 7 Cir., 357 F.2d 215, 220–221, cert. denied, 384 U.S. 943, 86 S.Ct. 1464, 16 L.Ed.2d 541, (1966); Bucher v. Krause, 7 Cir., 200 F.2d 576 (1952), cert. denied, 345 U.S. 997, 73 S.Ct. 1114, 97 L.Ed. 1404 (1953).

We are satisfied from the record here, as we were in Hannigan, that Hitachi's intentionally coercive and oppressive conduct warranted the assessment of punitive damages in the instant case, and that the sum of $50,000 though generous, was not excessive, and was well within the discretion of the jury and the trial court. Further, we have concluded that the jury was warranted in being unpersuaded by the several "affirmative defenses" tendered by the defendant.

Finally, we have considered the various objections to certain instructions given to the jury. Under our disposition of this appeal and on consideration of the instructions as a whole, we find no reversible error in this respect.

Without further prolonging this opinion, in light of the foregoing, we hold that (1) the award of $35,000 damages for loss of profits on Count I be reversed; (2) the award of $35,000 for loss of profits on Counts II and III be reversed; (3) the award of $27,000 damages for actual outlays and the award of $50,000 for punitive damages, both under Counts II and III, be affirmed; and (4) that the plaintiffs recover their costs from defendant. It is further ordered that this cause be remanded to the district court with instructions to enter judgment herein consistent with this opinion.

Affirmed in part; reversed in part. Remanded.