2012 COA 103

**SLATER NUMISMATICS, LLC, a Colorado limited liability company, Plaintiff–Appellant,**

v.

**DRIVING FORCE, LLC, d/b/a ANACS, a Colorado limited liability company, Defendant–Appellee.**

**No. 11CA0683.**

Colorado Court of Appeals, Div. III.

June 21, 2012.

Brett R. Lilly, LLC, Brett R. Lilly, Wheat Ridge, Colorado; Scott A. Hale, P.C., Scott A. Hale, Englewood, Colorado, for Plaintiff–Appellant.

Sander Ingebretsen & Wake, P.C., Daniel Rohner, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge TERRY.

¶ 1 Plaintiff, Slater Numismatics, LLC, appeals the trial court's summary judgment in favor of defendant, Driving Force, LLC, doing business as ANACS (ANACS). The court granted summary judgment for ANACS on Plaintiff's claims for intentional interference with contractual relations and unjust enrichment. It also entered an order awarding costs to ANACS. We reverse and remand for further proceedings.

¶ 2 As part of our analysis, we address and clarify the requirements for proof of the tort of intentional interference with contractual relations.

I.   Evidence Presented to the Trial Court

¶ 3 Because Plaintiff seeks reversal of the summary judgment entered in favor of ANACS, we must review the evidence presented to the trial court in the light most favorable to Plaintiff, the nonmoving party. *Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1074 (Colo.2010). Viewed in that light, the following evidence was presented to the trial court.

¶ 4 Plaintiff was in the business of purchase and sale of rare and modern coins. It had an ongoing relationship with Black Diamond Holding Company, doing business as Independent Coin Grading Company (ICG).

After purchasing coins, Plaintiff sent them to ICG to be graded and packaged for sale. After these tasks were completed, ICG forwarded the graded and packaged coins to Plaintiff's customer, Cable Shopping Network (Cable), which purchased the coins from Plaintiff. Cable would sell the graded coins through television infomercials and call centers.

¶ 5 Initially, ICG did not have a direct business relationship with Cable. However, after learning that Cable was purchasing large quantities of coins from Plaintiff, ICG approached Plaintiff and asked to enter into a referral agreement that would allow ICG to deal directly with Cable.

¶ 6 As a result of those discussions, Plaintiff and ICG entered into the Referral Agreement in issue here. That agreement provided that Plaintiff would refer to ICG all of the coin grading and valuing work for Cable. ICG would, "in good faith and with reasonable diligence, complete the work requested by [Cable] and bill [Cable] directly for all work performed." In exchange, ICG would pay Plaintiff each month a referral fee equal to 25% of the net grading fees derived from sales of grading services to Cable. Once the Referral Agreement was in place, Cable began purchasing its own coins and sending them directly to ICG to be graded, and ICG paid the referral fees to Plaintiff.

¶ 7 James Taylor was one of ICG's founding members. He worked for ICG from 1998 until 2005, when he left to work as the CEO for ANACS, a different coin grading company. Taylor returned to ICG in the role of Chief Executive Officer in 2007.

¶ 8 Brett Williams was ICG's Chief Financial Officer for nine years. In that capacity, he was responsible for billing customers for grading services.

¶ 9 While Taylor and Williams were employed by ICG, they signed employment agreements that prohibited the disclosure of confidential information that was obtained during the course of their employment at ICG.

¶ 10 Taylor learned of the Referral Agreement while he served as Chief Executive

Officer of ICG. Williams also knew about the Referral Agreement, and, as Chief Financial Officer of ICG, he was responsible for calculating the 25% fee due to Plaintiff each month under the Referral Agreement.

¶ 11 During Taylor's tenure as Chief Executive Officer of ICG, a dispute arose between ICG's shareholder representative and Taylor. In the wake of this dispute, Taylor began negotiations to purchase ICG. During the negotiations, Taylor discussed his intent to eventually purchase ANACS and merge that company with ICG. In a memorandum to other ICG principals, Taylor wrote: "We discussed purchasing ANACS and merging it, at the right time, with ICG.... This plan will likely include hiring away a number of the most important graders so ANACS [cannot] do its business, thereby being able [sic] to buy ANACS at a considerably lower price." The agreement to purchase ICG eventually collapsed.

¶ 12 While CEO of ICG, Taylor recognized that maintaining Cable as a client was critical to ICG's success. Cable's business generated a significant percentage of ICG's revenue, and Taylor referred to Cable as ICG's "golden goose." In a memorandum circulated to ICG employees, Taylor stated, "The [Cable account and one other account] are what pay our salaries.... We cannot lose them or give them any reason for even considering going elsewhere."

¶ 13 After his attempt to purchase ICG failed, Taylor again left ICG in November 2007. He formed defendant, Driving Force, LLC, which purchased ANACS one month after his 2007 departure. Williams was hired to be the Chief Financial Officer of ANACS on the same day he left his job at ICG.

¶ 14 Taylor and Williams, having taken over operation of ANACS, implemented a plan to render ICG noncompetitive, using similar tactics to those described in Taylor's earlier memorandum about a plan to hire away ANACS's employees. Drawing on his insider knowledge about ICG's operations, Taylor knew that a mass exodus of ICG staff would, as he stated in a memorandum, "leave[ ] [ICG] worthless and immediately unable to function," and ICG "[w]ould be out of business in weeks, if not sooner." This

was so because there are very few persons in the United States qualified to perform coin grading. With Taylor at the helm, ANACS hired away all but two of ICG's employees.

¶ 15 In addition to hiring away ICG's employees, Taylor moved ANACS's offices from Austin, Texas to Englewood, Colorado, two miles away from ICG's offices.

¶ 16 Because of their knowledge of Cable's purchase of coin grading services from ICG, the principals of ANACS were able to approach Cable with an offer to provide those same services. And, because ANACS did not have any obligation to pay the 25% referral fee to Plaintiff, ANACS was able to combine this competitive advantage with its knowledge of ICG's pricing structure to undercut ICG's price and acquire Cable's business.

¶ 17 Within a few months of Taylor's purchase of ANACS, Cable transferred its modern coin grading business from ICG to ANACS.

¶ 18 The trial court's order granting summary judgment to ANACS stated:

> For the purposes of this motion, the Court assumes that a reasonable jury could find that Mr. Taylor and Mr. Williams intentionally set out to take away ICG's business with [Cable] by hiring away ICG's employees and selling coins to [Cable] for less by avoiding the 25% Referral Fee, all in violation of their contractual and fiduciary duties to ICG.

We agree that this assumption is supported by the evidence, when viewed in the light most favorable to Plaintiff. However, we disagree with the trial court's conclusion that, notwithstanding that evidence, ANACS was entitled to summary judgment.

## II. Standard of Review

¶ 19 We review de novo a trial court's entry of summary judgment. *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Bd.*, 901 P.2d 1251, 1256 (Colo. 1995).

¶ 20 Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, to-

gether with the affidavits, if any, demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* C.R.C.P. 56(c); *Rocky Mountain Festivals*, 242 P.3d at 1074. Evidence properly before the trial court is viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the evidence, and resolving all doubts as to the existence of a material fact against the moving party. *Rocky Mountain Festivals*, 242 P.3d at 1074; *Wilson v. Prentiss*, 140 P.3d 288, 290 (Colo.App.2006).

### III. Intentional Interference with Contractual Relations

¶ 21 Plaintiff contends the trial court erred in granting summary judgment for ANACS on its claim for intentional interference with contractual relations. Because Plaintiff has alleged, and provided preliminary proof of facts tending to show, that the conduct of ANACS and its principals interfered with ICG's performance of its contract with Plaintiff in such a manner as to create a triable issue under Colorado law, we agree.

### A. Colorado Precedents on Intentional Interference with Contractual Relations and Their Reliance on Restatement (Second) of Torts

■ ¶ 22 Colorado Supreme Court precedents rely on the definition of the tort of intentional interference with contractual relations contained in § 766 of the Restatement (Second) of Torts (1977), which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person *by inducing or otherwise causing the third person not to perform* the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

(Emphasis added.) *See Trimble v. City & County of Denver*, 697 P.2d 716, 725–26 (Colo.1985), *superseded on other grounds by* § 24–10–105, C.R.S.2011; *Memorial Gardens, Inc. v. Olympian Sales & Management*

*Consultants, Inc.*, 690 P.2d 207 (Colo.1984); *see also Westfield Development Co. v. Rifle Inv. Associates*, 786 P.2d 1112, 1117 (Colo. 1990) (adopting definition of tort contained in Restatement (Second) of Torts § 766A (1979)).

¶ 23 Given the evidence presented to the trial court here, a reasonable jury could conclude that ANACS purposefully depleted the ranks of ICG, significantly impairing its ability to fulfill Cable's coin grading needs. When that circumstance is combined with ANACS's use of Plaintiff's confidential information—including knowledge of the 25% referral fee—to make a play for Cable's business while undercutting ICG's pricing, a reasonable jury could conclude that ANACS caused ICG "not to perform" its contract with Plaintiff, within the meaning of § 766.

■ ¶ 24 In reaching this conclusion, we are mindful of the following language employed by the supreme court in *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859 (Colo.2004):

> To be liable for intentional interference with contract, a defendant must 1) be aware of a contract between two parties, 2) *intend that one of the parties breach the contract*, 3) and *induce the party to breach or make it impossible for the party to perform* the contract. *See* [*Trimble*, 697 P.2d at 726]; *see also* [ ] Restatement (Second) of Torts § 766 comment h. In addition, the defendant must have acted "improperly" in causing the result. *Id.*

*Id.* at 871 (emphasis added) (footnote omitted).

¶ 25 ANACS here argues that, because Plaintiff has not demonstrated that ANACS either caused ICG to *breach* its contract with Plaintiff or rendered ICG's performance impossible, *Krystkowiak* mandates the entry of summary judgment against Plaintiff. We disagree for two reasons.

¶ 26 First, as noted above, earlier supreme court decisions adopted other definitions of the tort that do not require proof of either impossibility of performance or a breach of contract, but rather require proof that the defendant induced or otherwise caused a third party not to perform the contract at issue. *See Trimble*, 697 P.2d at 725–26

(adopting § 766 definition of tort); *Memorial Gardens*, 690 P.2d at 210 (same); *see also Westfield Development Co.*, 786 P.2d at 1117 (adopting definition of tort contained in Restatement (Second) of Torts § 766A (1979)).

¶ 27 In 1993, the supreme court adopted a definition of the tort that closely aligned with the provisions of § 766, in *Colorado National Bank v. Friedman*, 846 P.2d 159 (Colo.1993). There, the supreme court stated:

> The tortious conduct occurs when the defendant, not a party to the contract, induces the third party to breach the contract, or *interferes with the third party's performance of the contract.* Under Colorado law, the tort exists to protect parties to a contract; accordingly, it is the conduct of the third person who is not a party to the contract that is punished for *inducing a breach or preventing performance* of the contract.

*Id.* at 170 (citations omitted) (emphasis added); *but see Radiology Professional Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 577 P.2d 748, 751 (1978) (stating, "[t]he petitioner cannot recover for the alleged tortious interference with a contract because the agreement was nonexclusive in nature and had not been breached," and omitting discussion of other means of proving intentional interference claim).

¶ 28 *Krystkowiak* did not distinguish or disapprove of those earlier cases. On the contrary, *Krystkowiak* relied on *Trimble*, 697 P.2d at 725–26, which in turn relied on the definition of the tort described in § 766. *Trimble* did not contain the "inducement to breach" or "impossibility" language employed in *Krystkowiak.* Rather, *Trimble* simply quoted the language of § 766, and adopted that definition of the tort.

¶ 29 We discern no intent in *Krystkowiak* to overrule preexisting precedent concerning the elements of intentional interference with contractual relations. Because *Krystkowiak* did not repudiate the definitions of the tort expressed in *Friedman, Westfield, Trimble, Memorial Gardens*, or any of the supreme court's earlier precedents, we must assume that those precedents are still binding, and that Colorado courts may continue to apply the definition of the intentional interference tort contained in Restatement § 766. In our view, by discussing breach and impossibility in *Krystkowiak*, the supreme court was only expressing two of the possible ways in which the tort of intentional interference with contractual relations could be proved.

¶ 30 As discussed more fully below, our review of preexisting Colorado case law, together with decisions from other jurisdictions applying § 766, persuades us that Plaintiff here has presented evidence establishing a triable intentional interference claim.

¶ 31 Second, the facts presented here are distinguishable from those of *Krystkowiak.* That case involved a suit by a developer against an individual homeowner. The developer allegedly had entered into a settlement agreement with a neighborhood association of which the homeowner was a member. Despite that agreement, the homeowner continued to oppose the developer's plans to develop an apartment complex across the street from the homeowner's home. The city council ultimately denied the development proposal. The developer alleged that the homeowner intentionally interfered with the association's performance of the settlement agreement by his continuing to oppose the development. The supreme court disagreed, noting that the homeowner, as an individual, was not bound by the association's settlement with the corporation. The court indicated that the corporation's claim against the homeowner was not of the type intended to be encompassed by the tort of intentional interference, in part because there was no allegation that the homeowner's conduct was "improper as contemplated by *Trimble.*" 90 P.3d at 872.

¶ 32 Here, in contrast, and as discussed more fully below, Plaintiff has asserted and preliminarily demonstrated that ANACS's conduct was improper, and was intended to, and did, "cause" ICG "not to perform" its contract with Plaintiff, within the meaning of § 766.

¶ 33 Thus, while it is true that Plaintiff has not demonstrated either that ANACS induced ICG to *breach* its contract with Plaintiff, or that ANACS made ICG's performance

of the contract *completely impossible,* as more fully explained below, Plaintiff nevertheless preliminarily demonstrated that ANACS improperly interfered with the contract by causing ICG not to perform, and therefore the trial court erred in granting summary judgment for ANACS.

### B. The Meaning of "Inducing or Causing Not to Perform"

¶ 34 Older Colorado cases focused directly on the words "interfer[ing]" and "inducing or ... causing the third person not to perform the contract," as reflected in Restatement § 766.

¶ 35 In *Watson v. Settlemeyer,* 150 Colo. 326, 372 P.2d 453 (1962), the supreme court affirmed a judgment for the plaintiff on its claim for intentional interference with contractual relations. The court stated:

> Though [the third party] may have had the right to terminate [the plaintiff's] oral contract at will, ... [the defendant] had *no right to induce such an act or to intentionally interfere* between [the third party] and [the plaintiff] by promoting his purpose and intention to take over if [the third party] was successful in ousting [the plaintiff].

*Id.* at 330, 372 P.2d at 456 (emphasis added). Although there was an actual breach of contract in *Watson,* the supreme court's focus was on the interfering conduct of the tortfeasor.

¶ 36 In *Weber v. Nonpareil Baking Co.,* 85 Colo. 232, 236, 274 P. 932, 934 (1929), the supreme court stated that "contracts may impose a duty on third persons *not to interfere* with their performance." There, again, the focus was on the tortfeasor's conduct.

¶ 37 When considered in combination with Colorado precedents, the comments to Restatement § 766, modern case law from around the United States, and recent treatises and commentary persuade us that impacts short of total breach or impossibility may constitute "causing [a] third person not to perform [a] contract" within the meaning of that section.

### 1. Comments to § 766 and Interpretations in Other Treatises

¶ 38 Comment c to § 766 makes clear that inducement to breach is not an absolute requirement for liability under that section. It states:

> The *liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations....*
>
> The plaintiff's interest in his contractual rights and expectancies must be weighed, however, against the defendant's interest in freedom of action. If the defendant's conduct is predatory the scale on his side may weigh very lightly.... The issue is whether in the given circumstances his interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce. In deciding this issue, *the nature of his conduct is an important factor.*

Restatement (Second) of Torts, § 766 cmt. c (emphasis added).

¶ 39 From the comments to § 766, it is apparent that the authors of the Restatement intended to impart the following principles:

1. Conduct by the defendant in impairing a third party's performance of a contract with the plaintiff, short of inducing or causing the third party to breach a contract, may constitute actionable intentional interference with contractual relations, under appropriate circumstances.

2. Such circumstances may be present where, for example, but without limitation, there is some combination of the following elements:

    a. the defendant leaves the third party no choice but to fail in some significant aspect of performance, such as by depriving the third party of the means of performance;

    b. the defendant's conduct is wrongful; and

    c. the defendant acts either for the primary purpose of interfering with the performance of the plaintiff's contract, or knowing that the interference is

certain or substantially certain to occur as a result of the defendant's action.

*See* Restatement § 766 cmts. c, h, j, k, o, p.

¶ 40 Other treatises support this interpretation of the law. *See* 2 Fowler V. Harper, Fleming James, Jr. & Oscar F. Gray, *Harper, James and Gray on Torts* §§ 6.7, 6.9, at 366, 379 (3d ed. 2006) ("The contemporary view of the action is that it lies[ ] more broadly"; "Protection is afforded the interest in contractual relations against harms other than inducement of breach. We may generalize that any intended and unprivileged interference ... that causes loss to either party to a transaction is actionable by the party suffering the loss."); *id.* § 6.8, at 377 ("The term *inducing breach of contract* is somewhat misleading as a description of the tort in question.") (emphasis in original); *id.* § 6.5, at 356 ("The interest involved in this tort may be described as the interest of the individual in the security and integrity of the contractual relations into which he has entered."); W. Prosser & W. Keeton, *Torts* § 129, at 991 (5th ed.1984) ("no actual repudiation of the contract is necessary for liability"); *id.* at 979 ("It may be sufficient for liability that the defendant has acted intentionally to interfere with a known contract or prospect, that he has caused harm in so doing, and that he has acted in pursuit of some purpose considered improper."); *id.* at 945 (indicating that a defendant may be liable when it commits a tort against a person with whom the plaintiff has a contract: "If the plaintiff's interests and those of the contracting party are sufficiently close, a tort to the one may be sufficient basis for liability to the other, if harm results."); 1A *Callmann on Unfair Competition, Trademarks & Monopolies* § 9:16 (4th ed. 1981) ("Some cases treat interference as a more comprehensive concept than inducement of breach; and therefore hold that there may be tort liability where a contractual relationship is rendered less valuable or more burdensome by some impairment, even though it is not breached.").

¶ 41 "The most numerous of the tortious interference cases are those in which the disruption is caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach his contract with the plaintiff *or causes a third person not to confer a benefit on the plaintiff.*" Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine,* 49 U. Chi. L.Rev. 61, 106 (1982) (emphasis added). "In most jurisdictions, the fact of competition alone does not justify interference, and at least a prima facie case of liability attaches if the competitor *intentionally interferes with* a known contract." *Id.* (emphasis added) (citing Prosser, § 129, at 945).

2. Case Law from Other Jurisdictions

¶ 42 Our review of case law from around the United States indicates that, in circumstances such as those presented here, liability has been imposed on a defendant for intentional interference with contractual relations in the absence of a breach of contract or impossibility of performance, where the defendant has significantly induced or caused a contracting party not to perform its contract with plaintiff.

¶ 43 In *Getschow v. Commonwealth Edison Co.,* 111 Ill.App.3d 522, 67 Ill.Dec. 343, 444 N.E.2d 579 (1982), *aff'd in part and rev'd in part on other grounds,* 99 Ill.2d 528, 77 Ill.Dec. 83, 459 N.E.2d 1332 (1984), the plaintiff sued a utility company, Edison, for intentional interference with contractual relations. During the 1970s, the plaintiff represented building trades contractors, and sought out buyers for the contractors' services. The plaintiff had called on Edison's buyers for years and had been successful in getting Edison to hire contractors he represented, resulting in his earning commissions from the contractors. In 1976, Edison's vice president of purchasing sent a letter to seven of the plaintiff's contractor-clients, intimating that the plaintiff was not a bona fide commercial agent and that the contractors might be violating their contracts with Edison by using his services, thus giving Edison the right to cancel the contracts. Evidence showed that, before the letter was sent, Edison had investigated a claim that the plaintiff was demanding an improper "payoff" from contractors, and knew that the investigation

found nothing to substantiate a "payoff" allegation. Within a few months after receiving the letter, all seven of the contractors whom the plaintiff represented terminated their contracts with him.

¶ 44 Edison argued that the plaintiff could not maintain an intentional interference claim, because all of the plaintiff's contracts were terminable at will, and had lapsed or expired by their terms, and thus Edison could not have induced their breach. The Illinois court rejected this assertion, concluding that action short of inducing breach of the plaintiff's contracts with his clients could support the claim. *Id.* at 584–85, 67 Ill.Dec. 343, 444 N.E.2d 579. The court relied on the trial court's finding "that Edison, by its letters, effected 'economic duress' on [the] plaintiff's employers causing each of them to terminate their contract with [the] plaintiff." *Id.* at 585, 67 Ill.Dec. 343, 444 N.E.2d 579; *see also Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal.4th 26, 77 Cal.Rptr.2d 709, 960 P.2d 513, 530 (1998) (stating elements of intentional interference with contractual relations tort as "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach o[r] disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage"); *Phez Co. v. Salem Fruit Union,* 103 Or. 514, 201 P. 222, 232 (1921) (where promisee, a marketer of fruit drinks, had contract with farm union requiring farm union to provide marketer with all crops of specified growers, marketer could sue growers directly for interfering with farm union's ability to perform under contract), *cited in* 2 Harper, § 6.9, at 382 n. 12.

¶ 45 *Getschow* relied in part on *Hannigan v. Sears, Roebuck & Co.,* 410 F.2d 285 (7th Cir.1969), where the court addressed a factual scenario that bears some similarities to the facts here. There, a manufacturer contracted to manufacture cabinets exclusively for Hannigan. Hannigan sold the cabinets to its customers, the most significant of which was Sears. After learning of Hannigan's pricing structure, Sears undertook to eliminate him as the middleman to reduce the cost of the cabinets. Sears tried to have the manufacturer breach its contract with Hannigan. When the manufacturer declined to do so, Sears exerted pressure on the manufacturer to amend its contract with Hannigan to require the latter to accept significantly less compensation for the sales to Sears. *Id.* at 289–90.

¶ 46 In a similar manner to ANACS here, Sears defended on the basis that it had not induced any breach of Hannigan's contract with the manufacturer. *Id.* at 290. The court rejected that argument, concluding that the jury could have determined that the contract modification was involuntary, and "that Sears knew Hannigan had no practical alternative but to acquiesce in the contractual modification." *Id.* at 290–91.

¶ 47 In rejecting Sears's position that the facts did not state a claim for intentional interference with contract, the Seventh Circuit stated:

> To us, there is no legally significant distinction between unabashed third party conduct which induces one party to outrightly [sic] repudiate and breach its contract with another and subtle third party conduct which achieves essentially the same result through the equally questionable means of coercing a contractual modification. Both approaches are equally tortious in nature and similarly interfere with the contractual relationships of others.

*Id.* at 291; *but see George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.,* 719 F.2d 1326, 1331 n. 1 (7th Cir.1983) ("Hannigan is limited to instances where the interference results in the equivalent of a breach, achieving the same outcome as a breach through coercing a contractual modification. Absent persuasive indicia that the Illinois Supreme Court would extend the action for intentional interference with contract to cover instances of mere hindrance or increased burden, we will not do so.").

### 3. Salient Principles

■ ¶ 48 Based on our review of the relevant authorities, we agree with the Restatement's formulation of the intentional interference with contractual relations tort expressed in § 766 and the comments

thereto. Thus, we conclude that a defendant may be liable where, as pertinent here:

1. the defendant causes a third party to fail in some significant aspect of performance which the third party owes to the plaintiff, such as by depriving the third party in significant part of the means of performance; and

2. the defendant's conduct was wrongful; and

3. the defendant acted either for the primary purpose of interfering with the performance of the plaintiff's contract, or knowing that the interference was certain or substantially certain to occur as a result of the defendant's action.

*See* Restatement § 766 & cmts. c, h, j, k, o, p.

¶ 49 In so ruling, we agree with those authorities concluding that, in appropriate circumstances, a defendant's conduct short of causing breach or total impossibility of performance can be actionable under the theory of intentional interference with contractual relations. As stated in *Hannigan,*

> To distinguish between conduct which directly causes a breach of contract and unjustifiable coercive conduct which effects the same result without a breach would overly limit the significance of the tort of inducing breach of contract and invite today's superior economic forces to freely interfere with contractual relationships without fear of legal reprisal.

410 F.2d at 291 (citing Prosser, § 123, at 959); *cf. Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 131 Cal. Rptr.2d 29, 63 P.3d 937, 958 (2003) (in action for intentional interference with prospective business relations, stating, "[a]n actor engaging in unlawful conduct with the knowledge that its actions are certain or substantially certain to interfere with a party's business expectancy should be held accountable").

C. Application to Facts Presented Here

¶ 50 Here, under the Referral Agreement, Plaintiff was entitled to receive a fixed percentage of proceeds—net grading fees—from ICG's sales to Cable. Plaintiff's economic reward was thus dependent on ICG's ability to serve Cable's coin grading needs.

¶ 51 As alleged and preliminarily shown here, a reasonable jury could conclude that ANACS caused ICG to fail in a significant aspect of performance owed to Plaintiff by depriving ICG in a significant manner of the means of performance. A jury could conclude that, by hiring away nearly all of ICG's employees, in a market where there are very few persons qualified to perform coin grading services, ANACS so substantially interfered with ICG's ability to render services to Cable as to cause ICG not to perform its Referral Agreement with Plaintiff.

¶ 52 Taylor's memoranda could support the conclusion that ANACS acted either for the primary purpose of interfering with the performance of Plaintiff's contract, or knowing that the interference was certain or substantially certain to occur as a result of ANACS's action.

¶ 53 The evidence could be interpreted as showing that the impact of ANACS's conduct on Plaintiff was not incidental, but was a key part of the plan. The alleged tortious conduct was integrally related to Plaintiff's 25% referral fee. Taylor and Williams could exploit their knowledge of Plaintiff's relationship with Cable, acquired through the Referral Agreement, so that ANACS could approach Cable directly and undercut ICG's pricing structure precisely by eliminating the need to pay that 25% referral fee to Plaintiff. Thus, as in *Getschow* and *Hannigan,* this conduct tends to show much more than an incidental harmful impact on Plaintiff's economic interest. *See also* Perlman, 49 U. Chi. L. Rev. at 106 ("Defendants have been held liable for offering lower prices with knowledge of an existing contract and for seeking to replace the plaintiff as an exclusive agent or dealer by offering better terms.").

¶ 54 Plaintiff has also submitted evidence to prove that ANACS's conduct was wrongful. A reasonable jury could conclude that Taylor and Williams wrongfully used confidential information they acquired about the pricing structure of Plaintiff's Referral Agreement through breach of their confidentiality agreements with ICG. As officers of

ANACS, their knowledge of the Referral Agreement is imputed to the company. *See Hummel v. First Nat'l Bank*, 2 Colo.App. 571, 578–79, 32 P. 72, 75 (1892) (principal is chargeable with information acquired by agent). A jury could also conclude, from Taylor's memoranda, that ANACS's conduct was wrongful. This is particularly true of the memorandum stating that "mass resignations ... at ICG [would leave] it worthless and immediately unable to function," and that ICG "[w]ould be out of business in weeks, if not sooner."

¶ 55 Thus, as alleged here, a reasonable jury could conclude that ANACS's conduct satisfied the elements of wrongfulness required under *Memorial Gardens*, 690 P.2d at 210. That case adopted the factors set forth in Restatement (Second) of Torts § 767 (1979):

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement § 767.

¶ 56 We can think of no principled reason for rejecting a theory of intentional interference with contract that would insulate ANACS's alleged conduct from liability to Plaintiff. While an outside observer could chalk up such collateral damage to Plaintiff by remarking, "That's just the nature of competition," we believe such alleged conduct fits within the very purpose for imposing tort liability on intentional interference with contractual relations.

¶ 57 The alleged employment of wrongful means to accomplish ANACS's intentional interference with Plaintiff's contractual relations with ICG distinguishes this case from the scenario described in the Restatement (Second) of Torts § 768, quoted with approval in *Memorial Gardens*, 690 P.2d at 210–11. That section provides, in part:

(1) One who intentionally causes a third person not to ... continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) *the actor does not employ wrongful means* and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768(1) (1977) (emphasis added); *see also Westfield Development*, 786 P.2d at 1117–18.

¶ 58 Plaintiff has also submitted evidence to establish the intent element of the intentional interference tort. *See Comtrol, Inc. v. Mountain States Tel. & Tel. Co.*, 32 Colo. App. 384, 387, 513 P.2d 1082, 1084 (1973) (discussing intent to induce breach of contract). A reasonable jury could find that ANACS knew that its actions in recruiting almost all of ICG's employees would ultimately cause ICG not to perform under the Referral Agreement with Plaintiff. *See id.* at 1085 (existence of requisite intent is a jury question). Moreover, a jury could reasonably determine that, by using knowledge acquired while employed at ICG, the principals of ANACS were able to undercut ICG's price with the intent to divert its business to ANACS and with knowledge that such a scenario would harm Plaintiff's ability to receive its referral fee from ICG.

¶ 59 We conclude that Plaintiff here has established a triable claim for intentional interference with contractual relations. The evidence submitted to the trial court in opposition to the summary judgment motion was sufficient to create triable issues of fact, such that summary judgment should have been denied as to this claim.

¶ 60 Because of our conclusion that Plaintiff has established a triable claim based on § 766 of the Restatement, we need not address ANACS's contention that Plaintiff lacks standing to assert a claim for intentional interference with contract under Restatement § 766A.

## IV. Unjust Enrichment

¶ 61 Finally, Plaintiff contends the trial court erred in granting summary judgment for ANACS on Plaintiff's claim for unjust enrichment. We agree.

¶ 62 To recover under a theory of quasi-contract or unjust enrichment, a plaintiff must show that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation. *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo.2008); *DCB Constr. Co. v. Cent. City Dev. Co.,* 965 P.2d 115, 119 (Colo.1998). "Application of the doctrine does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred." *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n,* 649 P.2d 1093, 1097 (Colo. 1982).

¶ 63 Here, when viewed in the light most favorable to Plaintiff, the evidence shows the following: Plaintiff introduced ICG to Cable, and in accordance with the Referral Agreement, ICG was allowed to deal directly with Cable, so long as Plaintiff received the referral fee. Taylor and Williams, as employees of ANACS, then improperly used confidential information about the relationship with Cable and the pricing structure under the Referral Agreement to improperly secure Cable's business. A reasonable jury could determine that ANACS received a benefit at Plaintiff's expense, under circumstances that would make it unjust for ANACS to receive the benefit without compensating Plaintiff.

¶ 64 Therefore, we conclude that summary judgment should not have been granted on the unjust enrichment claim.

## V. Costs Award

¶ 65 Based on our conclusion that summary judgment should have been denied on both of Plaintiff's claims, we also reverse the award of costs to ANACS.

## VI. Conclusion

¶ 66 The judgment and costs order are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

Judge ROY and Judge GABRIEL concur.