24CA0257 Parsons v Timberline 12-05-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0257
Mesa County District Court No. 21CV30267
Honorable Richard T. Gurley, Judge

---

Robb Parsons,

Plaintiff-Appellant,

v.

Timberline Bank, Angela Johnson, and Doug May,

Defendants-Appellees,

and

WealthSource Partners, LLC,

Defendant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Grove and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 05, 2024

---

Wegener Lane & Evans, P.C., Benjamin M. Wegener, Brendan Reilly, Grand Junction, Colorado, for Plaintiff-Appellant

Lewis Roca Rothgerber Christie LLP, Susan S. Sperber, Joseph Hykan, Denver, Colorado, for Defendant-Appellee Timberline Bank

Miletich PC, Amy L. Miletich, James M. Miletich, Denver, Colorado, for Defendant-Appellee Angela Johnson

Starritt Legal, LLC, Sam D. Starritt, Grand Junction, Colorado, for Defendant-Appellee Doug May

¶ 1    In this civil action for breach of contract, interference with contractual relations, and civil conspiracy, plaintiff, Robb Parsons, appeals the district court's grant of summary judgment in favor of defendants, Timberline Bank, Angela Johnson, and Doug May. We affirm.

I.    Background

¶ 2    Parsons, an investment advisor, previously worked at Wells Fargo Private Bank as part of a team with Johnson, a private banker. When he was laid off in late 2018, Parsons joined WealthSource Partners (WP) to provide investment services to their clients. WP leased office space in a Timberline Bank branch, and Parsons and Johnson, who remained at Wells Fargo, continued to provide financial services to their mutual clients.[1] Doug May was a financial investment advisor for WP.

¶ 3    After leaving Wells Fargo, Parsons spoke to Johnson and another team member, Robert Tesch, about forming a new business and working with WP to provide investment services. The venture

---

[1] Robert Tesch, another financial advisor who was part of the team at Wells Fargo, followed Parsons to WP, but is not a party in this appeal.

involved referring his and Tesch's investment clients at WP to Timberline for private banking services.  Parsons asked Johnson to be equal partners with him in the Timberline venture; however, Johnson declined because of the financial risks associated with starting a new business and because she did not believe it was in her clients' best interests.

¶ 4    After further negotiations, Johnson eventually left Wells Fargo and joined Timberline as a private banker.  She brought many of her existing Wells Fargo clients with her, including clients who received investment advice from Parsons.  Maintaining a common group of clients was made possible by a solicitation agreement between WP and Timberline.  Under the agreement, Timberline introduced its private banking clients to WP in exchange for a fee.  Parsons was not a party to the agreement, and there was no "ownership" of clients since the clients were free to move their money at any time.  Parsons never executed a written employment contract with WP but instead worked as an at-will employee.

¶ 5    On August 10, 2021, police arrested Parsons on an outstanding warrant for violating a protection order entered in a domestic relations case.  He was released on August 16, but, in

violation of WP's compliance policies and procedures, he failed to immediately report his arrest to WP. WP learned of Parsons' arrest several days after his release and initiated its own investigation. On August 20, 2021, WP terminated Parsons for violating company policy by failing to promptly report his arrest.

¶ 6 WP and Timberline then developed a script used to contact Parsons' clients and to inform Timberline employees of Parsons' termination. The script said that WP had terminated its relationship with Parsons, that Parsons no longer had access to account systems, that client assets would continue to be managed by WP financial professionals, and that Parsons no longer had access to Timberline facilities or team members. Johnson was tasked with notifying clients she shared with Parsons of his termination. To ensure client continuity, WP hired Johnson to replace Parsons on August 26, 2021.

¶ 7 Parsons filed his initial complaint in October 2021 and an amended complaint in April 2022. As relevant here, he alleged that Johnson, Timberline, and May intentionally interfered with his employment contract with WP, intentionally interfered with his contractual relationships with clients, and civilly conspired to

3

accomplish such interference.[2]  His allegations were based in part on a series of emails exchanged between Johnson and May in March and April 2021 (Exhibit 6), months before his arrest. Johnson considered May a mentor and expressed dissatisfaction with her current employment and possible career paths.  She sought May's advice on how she should proceed, particularly considering Parsons' desire to retire in 2025.  Excerpts relied on by Parsons for his interference claims include an email from May to Johnson stating,

> What I'm saying is that in the event you felt like it was in clients [sic] best interest to move QUICKLY away from Robb, the best bet would be to line up something with one of these outside firms, rather than create your own [Registered Investment Advisor] or create an alternative within the WealthSource universe. Hopefully, that's not something that will need to happen.  If it did, however, I could make some introductions.  This email will self-destruct (I wish) in 15 seconds . . .  No, didn't happen?  Darn.

¶ 8    Another email from May to Johnson, in which May relays to Johnson a list of thoughts regarding each party, read as follows:

---

[2] He also alleged defamation claims, which have been withdrawn and dismissed; a breach of contract claim against WP that is not before us on appeal; and an exemplary damages also dismissed.

4

The suggestion I've outlined provides Angela with additional support from the new WealthSource advisor, will increase her compensation through the 25% solicitation fee that Timberline would receive on the $40MM book of business (perhaps $60K-75K/year), and it will give her a slice (10-20%) of the TLWM de novo [Registered Investment Advisor] that would ultimately be launched to manage this book of business. By getting a new successor WealthSource advisor in the mix, now, there will be greater client satisfaction and retention when Robb ultimately decides to transition out and it provides capacity, now lacking, to continue building a larger book of business, including smaller mass affluent accounts. Robb will be able to enjoy his easy schedule and terrific salary for a longer period of time, without worrying about the problems created by the lack of support he is providing Angela. While monetizing the book of business is nice, the longer he can relax with his $750K gig, the better off he'll be because he will always have the monetization option at the end. However, he will also have to reduce his current level of compensation in order to lock in "easy street." He will not want to do this, but his alternative is that he and a new Timberline entity go head to head to compete for the clients, which simply leaves both parties worse off.

¶ 9    Another email from May to Johnson read,

My personal belief is that this proposed solution is a Win-Win-Win-Win-Win-Win. The greatest difficulty will be getting Robb's agreement. However, this difficulty is not a reflection of the quality of the proposal, so

much, as the fact that Robb is now getting the lion's share of the economic benefits of leaving Wells Fargo, while Timberline Bank (Angela) is doing much of his work for him. The unfairness of the status quo naturally leaves him feeling like he will be disadvantaged by this proposal. However, if the status quo cannot continue for much longer, and if he will be much worse off if he fails to renegotiate and the current working relationship dissolves, along with the current partnership, then he (and WealthSource) will be much worse off if he doesn't agree to renegotiate the original terms. If the attempt to negotiate a more equitable partnership agreement with Robb fails, then Angela and Timberline Bank have other options, however it is difficult to imagine that those options will incorporate WealthSource Partners in the vendor mix and these "hard ball" alternatives are not discussed here.

¶ 10    Parsons also relied on a picture of a text message thread sent the day before Parsons' termination between Johnson and Bryan Sullivan, the CEO of WP (Exhibit 9). The messages read,

> Sullivan: I've got a really weak signal. I'll give you a call tonight.
>
> Johnson: Ian [sic] available now and then again after 3pm mountain time.
>
> Sullivan: Angella…I went and had the call this morning with the rest of the team. When you and Doug have a minute, feel free to call me and I'll catch you up.
>
> Johnson: Yes I should be available.

> Sullivan: I'm on the other line, can I call you
> back in a few minutes?

¶ 11    In response to the above emails and texts, Exhibit 6 also included one email response from Johnson to May which read,

> Anne had mentioned to [sic] that you would be joining the board.  Congrats, you will be a great addition.  I am glad you had a good time in Frisco even if you did suffer from altitude sickness.  My husband suffers at about the same elevation, and he is a lifelong resident also.  Should we have lunch again in the next couple of weeks, so I can share my thoughts since our last conversation?

¶ 12    The defendants each filed a motion for summary judgment, and the district court granted summary judgment in their favor on the intentional interference and civil conspiracy claims.

## II.    Contractual Interference with WP

¶ 13    Parsons contends that the district court erroneously granted summary judgment in favor of Johnson on his contractual interference claim with WP.  He reasons that Johnson induced WP to terminate his employment for Johnson's and May's benefit and that Exhibits 6 and 9 establish genuine issues of material fact.  We are not persuaded.

A.     Standard of Review and Applicable Law

¶ 14     We review a grant of summary judgment de novo. *W. Elk Ranch, L.L.C. v. United States*, 65 P.3d 479, 481 (Colo. 2002). Summary judgment should be granted only when the pleadings and the supporting documentation show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Id.*; *see also* C.R.C.P. 56(c). "The nonmoving party is entitled to the benefit of all favorable inferences from the undisputed facts, and all doubts as to the existence of a triable issue of fact must be resolved against the moving party." *W. Elk Ranch,* 65 P.3d at 481.

¶ 15     A "material fact" is one that will affect the outcome of the case or claim. *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). In determining whether a genuine issue of material fact exists, we consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." C.R.C.P. 56(c). "The moving party bears the initial burden of showing no genuine issue of material fact exists; the burden then shifts to the nonmoving party to establish a triable issue of fact." *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 20. All favorable

8

inferences that can be drawn from the record must be resolved in favor of the nonmoving party. *People in Interest of S.N. v. S.N.*, 2014 CO 64, ¶¶ 15-16.

¶ 16    In meeting their burdens, both parties must present, or establish the existence of, evidence that would be admissible at trial. C.R.C.P. 56(e). Triable issues of fact cannot be raised through argument, conjecture, denials in the pleadings, or assertions of legal conclusions unless they are supported by evidence. *S.N.*, ¶17 (quoting *Ginter v. Palmer & Co.*, 585 P.2d 583, 585-86 (Colo. 1978)).

¶ 17    To be found liable for intentional interference with a contract, a defendant must (1) be aware of a contract between two parties; (2) intend that one of the parties breach the contract; and (3) induce the party to breach or make it impossible for the party to perform the contract. *Slater Numismatics, LLC v. Driving Force, LLC*, 2012 COA 103, ¶ 24. Additionally, the defendant must act "improperly" in causing the result. *Id.* (quoting *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004)).

¶ 18    In deciding whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of

another is improper, courts consider (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1117–18 (Colo. 1990) (citing Restatement (Second) of Torts § 767 (Am. L. Inst. 1979)).

## B.  Analysis

¶ 19    Based on our de novo review of the record, we conclude there is no issue of material fact concerning Johnson's alleged interference with Parsons' employment contract with WP and thus, discern no legal error by the court in granting summary judgment on this claim.

¶ 20    Parsons relies on Exhibits 6 and 9 to infer that Johnson and May were conspiring to take over his book of business at WP. He further argues that Johnson improperly informed WP and his clients of his arrest. We are not convinced because the undisputed

record shows that WP terminated Parsons because Parsons violated company policy by failing to timely inform WP of his arrest.

¶ 21 To begin, the parties do not contest that Johnson knew of Parsons' employment relationship with WP. Whether that contract was written or oral does not affect the outcome of the interference claim. However, Parsons does not identify any specific communication in Exhibit 6 (or Exhibit 9) that states, much less suggests, that Johnson improperly induced or intended WP to terminate his employment. To the contrary, the communications discuss possible future business arrangements, some of which included Parsons, and they noted Parsons' continued receipt of income from WP. And while we acknowledge that we must construe inferences in favor of the nonmoving party, we discern nothing in these exhibits from which we can reasonably infer Johnson's wrongful conduct. Indeed, most of the communications were initiated by May, not Johnson, and her single response reveals nothing indicating wrongful conduct, a necessary element of contractual interference.

¶ 22 In any event, the record contains multiple documents, including the company's policies and WP's termination letter,

11

demonstrating that WP terminated Parsons because he had failed to timely disclose his arrest. Included in those documents are letters sent from WP to Parsons stating that WP had become aware that Parsons was wrongly informing his former clients (after his arrest) that Johnson was responsible for his termination and reminding Parsons that his violation of company policy, not Johnson's conduct, was the reason he was terminated. While Parsons may believe Johnson was responsible for his termination, he produced no evidence to counter the undisputed record evidence demonstrating that WP terminated Parsons for violating company policy.

¶ 23    Finally, we are not convinced that the text message exchange in Exhibit 9 or the potential phone call between Johnson and WP's CEO the day before WP terminated Parsons demonstrates Johnson's wrongful conduct. First, there is only speculation, no evidence, that the phone call ever occurred. Moreover, even if Johnson had informed WP of Parsons' arrest, it would not constitute interference with a contractual relationship because it does not constitute wrongful conduct.

¶ 24 Additionally, the undisputed record shows that Timberline developed a script for informing Parsons' clients of his termination and that Johnson contacted Parsons' former clients at Timberline's request using that script. And Parsons identifies nothing in the record showing that Johnson acted on her own to cause his termination. Thus, the record shows no wrongful conduct.

¶ 25 Because litigants cannot avoid summary judgment by merely asserting a fact without any evidence to support it, *Norton v. Dartmouth Skis, Inc.*, 364 P.2d 866, 868 (Colo. 1961), we discern no error in the court's ruling granting Johnson's motion for summary judgment on the contractual interference claim.

### III.  Contractual Interference with Clients

¶ 26 Parsons next contends that the district court erroneously granted summary judgment in favor of Johnson, Timberline, and May on his contractual interference with clients claim. He asserts that Johnson veered from the prepared script and, instead, told clients that Parsons had "done a lot of bad things" and had "been in jail for six days so he must have done something really bad." Parsons also asserts that May told his former clients that he agreed

13

with Parsons' termination. For the same reasons described above, we discern no legal error.

## A.    Analysis

¶ 27    Applying the previously described legal principles related to summary judgment and intentional interference, we conclude that summary judgment was proper, for four reasons.

¶ 28    First, Parsons provided no evidence to show that he possessed some type of ownership over his client base. Indeed, the undisputed record shows that Parsons' former clients were WP's clients and that they were free to change advisors or leave WP at will.

¶ 29    Second, nothing in the record shows that any of Parsons' former clients were contacted until *after* WP terminated him. And because Parsons was no longer employed, such contact necessarily could not have interfered with an existing client relationship.

¶ 30    Third, we are not convinced that Parsons' deposition testimony, asserting that Johnson had bad-mouthed him to his clients, established wrongful conduct because he presented no affidavits or other evidence from any former client saying this had occurred. Moreover, when asked about Johnson's alleged

statements, Parsons admitted, "I don't know exactly the details of what she told them."

¶ 31    Finally, to the extent Parsons contends that Exhibits 6 and 9 show interference with his clients, we disagree and conclude, consistent with our conclusion above, that those communications contain no evidence of an intention or an inducement to interfere with Parsons' existing client base but, instead, reflect a potential for future business arrangements.  Parsons presented no evidence to show that anything discussed in those communications came to fruition.

¶ 32    Accordingly, we affirm the court's summary judgment ruling on Parsons' intentional interference with clients claim.

IV.    Civil Conspiracy

¶ 33    Parsons last contends that the district court erroneously granted summary judgment in favor of Johnson, Timberline, and May on his civil conspiracy claim.  We disagree.

¶ 34    A claim of civil conspiracy requires the plaintiff to establish five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the

proximate result thereof.  *Walker v. Van Laningham,* 148 P.3d 391, 396 (Colo. App. 2006).  Civil conspiracy is a derivative cause of action.  *Rosenblum v. Budd,* 2023 COA 72, ¶ 51.  Therefore, "[i]f the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself."  *Id.* (quoting *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.,* 97 P.3d 140, 146 (Colo. App. 2003)).

¶ 35　　For the reasons previously described, we have concluded that Parsons failed to prove his contractual interference claims.  And because he has failed to prove the underlying wrong, there is no cause of action for conspiracy to commit contractual interference.  *See id.*  Accordingly, we discern no error in the district court's grant of summary judgment on the civil conspiracy claim.

## V.　Disposition

¶ 36　　The judgment is affirmed.

JUDGE GROVE and JUDGE LUM concur.

16